DOLPHIN INTERNATIONAL OF PUERTO RICO, INC., demandante y recurrida, *v.* RYDER TRUCK LINES, INC. y OTROS, demandados y recurrentes.

*Número:* RE-85-250 *Resuelto:* 31 de enero de 1991

*Pedro J. Santa-Sánchez,* de *O'Neill & Borges,* abogado de los recurrentes; *María Soledad Piñeiro* y *Nelson Biaggi García,* de *Ramírez, Látimer & Biaggi,* abogados de la recurrida.

LA JUEZ ASOCIADA SEÑORA NAVEIRA DE RODÓN emitió la opinión del Tribunal.

Este caso nos permite, entre otras cosas, analizar el alcance de la disposición constitucional que garantiza a los empleados el derecho "a escoger libremente su ocupación y a renunciar a ella". Art. II, Sec. 16, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 327. Antes de comenzar el análisis corresponde hacer una exposición de los hechos pertinentes a las controversias planteadas.

I

*Los hechos*

La demandante Dolphin International of Puerto Rico, Inc. (en lo sucesivo Dolphin) es una corporación creada al amparo de las leyes del Estado Libre Asociado de Puerto Rico, con oficinas principales en la ciudad de Carolina. Esta corporación se dedica al negocio de recibir, almacenar y entregar mercancía que llega en

furgones desde fuera de Puerto Rico, las cuales se consignan a favor de clientes en Puerto Rico.

La codemandada Ryder Truck Lines, Inc. (en lo sucesivo Ryder) es una corporación organizada bajo las leyes del estado de Florida, EE. UU., con oficinas principales en la ciudad de Jacksonville, Florida, y autorizada para hacer negocios en el Estado Libre Asociado de Puerto Rico. En enero de 1978 Dolphin y Ryder dieron inicio a una relación comercial mediante la cual Dolphin actuaba como agente comercial de Ryder. Los servicios prestados por la demandante consistían en recibir furgones enviados por clientes de Ryder desde Estados Unidos, almacenar su contenido y distribuirlo a consignatarios localizados en Puerto Rico. Para poder operar, Dolphin contaba con una estructura organizativa integrada por un grupo de oficiales. Además, en el área operacional, utilizaba los servicios de un gerente, un asistente de gerente, un representante de servicios al cliente, un supervisor de almacén, personal de contabilidad, personal de facturación (encargados del manejo de la carga), personal de almacén y conductores de camiones. El gerente era responsable de todo el personal y de tomar las decisiones necesarias para el manejo de la empresa, esto es, ejercía la función administrativa de ésta. En ausencia del gerente, el asistente del gerente fungía como administrador.

El representante de servicios al cliente se encargaba del servicio directo a éstos. Entre sus responsabilidades estaba notificar a los clientes sobre la disponibilidad de sus cargamentos y el *status* de los mismos en cuanto a determinar el pago de arbitrios y cargos por transportación. Conservaba el archivo de cada una de las compañías clientes con sus respectivos documentos e información relativa a las personas de enlace con éstas. Se encargaba, además, de indagar sobre los servicios que requerían los clientes y contestaba las interrogantes que éstos tenían referentes a sus cargamentos. Por su parte, el supervisor del almacén era responsable de los empleados del almacén dedicados a la carga y descarga. Además, registraba la localización de la carga dentro del almacén y mantenía un itinerario del contenido

de los furgones para descargarlos en aquél. Estas cuatro (4) posiciones eran las de mayor relevancia dentro de la estructura organizativa y operacional de la empresa.

Debido a la relación comercial establecida entre Dolphin y Ryder, la demandante le concedió a Ryder un espacio de oficina en sus facilidades físicas para que ésta mantuviera allí a un empleado suyo. Este empleado estaría dedicado al mercadeo y venta de los servicios que prestaba Ryder, a través de Dolphin, a sus clientes en Puerto Rico.

La relación comercial entre Dolphin y Ryder continuó de forma ininterrumpida hasta el 26 de junio de 1978. En esa fecha el Sr. Larry Porter, representante de Ryder en Puerto Rico, le informó a Dolphin que Ryder iba a establecerse por su cuenta en Puerto Rico, razón por la cual prescindiría de los servicios de la demandante. Para esa fecha los codemandados Joseph D'Bella, Elba Meléndez y Alejo Rivera llevaban varios años trabajando para Dolphin y ocupaban las posiciones de gerente, representante de servicios al cliente y supervisor del almacén, respectivamente. El 24 de junio de 1978 el señor D'Bella presentó su carta de renuncia a Dolphin. Su renuncia sería efectiva el 28 de ese mismo mes y año. Por su parte, la señora Meléndez y el señor Rivera presentaron sus cartas de renuncia el 23 de junio de 1978 para ser efectivas el 30 de junio de 1978. Todos estos empleados irían a trabajar con la codemandada Ryder, ocupando puestos de igual o superior jerarquía a los que desempeñaban en Dolphin.

Así las cosas, el 7 de junio de 1979 Dolphin presentó demanda por daños y perjuicios contra Ryder, Joseph D'Bella, Mildred Arroyo, Elba Meléndez y Alejo Rivera.[1] En su demanda alegó lo siguiente:

> Que Ryder negligente, intencional y maliciosamente, con conocimiento de quiénes eran los empleados principales de la demandante para correr dicho negocio, sin los cuales el mismo prácticamente se paralizaría, intervino en la relación contractual entre éstos y la

---

[1] En la acción fue incluida como demandada la Srta. Mildred Arroyo, quien también renunció a la posición que ocupaba en calidad de asistente del gerente, pero Dolphin desistió de su reclamación contra ella debido a que no pudo ser emplazada.

demandante y causó y obtuvo que dichos empleados renunciaron [sic] a sus respectivos empleos con la demandante y se fueran a trabajar con Ryder. Apéndice E, pág. 23.

Alegó, además:

Que los codemandados Joseph D'Bella, Mildred Arroyo, Elba Meléndez y Alejo Rivera, conspiraron entre sí y con Ryder y actuaron dolósamente [sic] por lo que son solidariamente responsables junto con Ryder de los daños causados a la parte demandante. Apéndice E, pág. 24.

El 30 de julio de 1979 los demandados contestaron la demanda y, a su vez, presentaron reconvención contra Dolphin alegando que, "con motivo de haber instituído [sic] un pleito malicioso y de haber dado conocimiento del mismo a terceros" (Apéndice F, pág. 27), la demandante les causó "serios daños a [la] reputación y prestigio" (íd.) de los demandados. En la reconvención, la codemandada Ryder alegó, además, que por haber incumplido Dolphin con sus obligaciones para con ésta se afectaron sus negocios y sufrió daños.

Trabada así la controversia, luego de un prolongado trámite procesal, el 10 de abril de 1985 el tribunal de instancia dictó sentencia parcial mediante la cual dispuso de algunas de las reclamaciones en el caso.(2) Específicamente declaró con lugar la demanda y concluyó "que Ryder interfirió en las relaciones contractuales entre Dolphin y sus empleados y debido a ello le es responsable a Dolphin de los daños que esto le causó". Apéndice A, pág. 9. Desestimó "la reconvención radicada por Ryder contra Dolphin por no haberse probado ninguno de los elementos de la misma". Íd. Luego de haberse dispuesto de las reclamaciones en cuanto a la responsabilidad, señaló que la prueba de los daños

---

(2) A pesar de que dicha sentencia fue intitulada como "sentencia sumaria", en realidad se trata de una sentencia parcial. La misma cumple con los requisitos de la Regla 43.5 de Procedimiento Civil, 32 L.P.R.A. Ap. III. La sentencia era parcial en tanto y en cuanto finalizó las controversias planteadas en la reconvención y parcial interlocutoria en cuanto a la determinación de responsabilidad. *Camaleglo v. Dorado Wings, Inc.*, 118 D.P.R. 20 (1986).

"sería presentada en su día, una vez se señale la continuación del presente caso".[3] Íd.

El tribunal a quo le adjudicó responsabilidad a los codemandados fundamentándose en las disposiciones del Art. 1802 del Código Civil, 31 L.P.R.A. sec. 5141, en su modalidad de interferencia culposa con las obligaciones contractuales de terceros, o sea, el deber de no interferir con las obligaciones contractuales con la intención de lograr su incumplimiento, causa de acción reconocida en nuestra opinión de *Gen. Office Prods. v. A.M. Capen's Sons*, 115 D.P.R. 553 (1984).

De esta sentencia parcial acudieron los demandados ante nos en solicitud de revisión. Alegaron los señalamientos de error siguientes:

1. Erró el Honorable tribunal de instancia al imponer responsabilidad, en las circunstancias particulares de este caso, a quien concede empleo a un trabajador, en ausencia de un contrato a término fijo o pacto restrictivo alguno entre éste y su anterior patrono.

2. Erró el Honorable tribunal de instancia en su aplicación al presente caso de la norma vigente sobre interferencia con relaciones contractuales.

3. Erró el Honorable tribunal de instancia al negarse a desestimar la reclamación contra todos los demandados, descartando el derecho constitucional de todo trabajador a renunciar a su empleo.

4. Erró el Honorable tribunal de instancia al formular determinaciones de hecho sin apoyo alguno en la prueba y al basar sus determinaciones de hecho y conclusiones de derecho, casi literalmente, en un alegato sometido por la parte demandante.

---

[3] El 3 de mayo de 1985 los demandados recurrentes solicitaron determinaciones adicionales de hechos y conclusiones adicionales de derecho. Solicitaron, además, que debido a que la sentencia parcial fue dictada únicamente en contra de la codemandada Ryder y nada se concluyó en cuanto a la responsabilidad que pudiesen tener los restantes codemandados, y dado que de la prueba desfilada no surge que dichos empleados tengan responsabilidad alguna, procediera a enmendar la sentencia parcial a los efectos de decretar la desestimación de la demanda en contra de los codemandados Joseph D' Bella, Elba Meléndez y Alejo Rivera. Dicha moción fue declarada sin lugar el 8 de mayo de 1985.

5. Erró el Honorable tribunal de instancia al descartar prueba muy pertinente al caso.

6. Erró el Honorable tribunal de instancia al desestimar la reconvención instada contra la demandante.

Decidimos revisar y expedimos el auto.

## II

*La responsabilidad del patrono que ofrece empleo y el derecho constitucional de todo trabajador a escoger libremente su ocupación y a renunciar a ella*

La controversia principal en el caso de autos, recogida en el primer, segundo y tercer señalamiento de error, plantea las interrogantes siguientes: ¿Qué responsabilidad tiene un patrono que ofrece y concede empleo a un trabajador quien, al momento de recibir la oferta, está empleado con otro patrono? ¿Qué responsabilidad tiene el empleado que acepta tal oferta de empleo?

La respuesta a la primera pregunta está, en parte, estrechamente vinculada a la contestación que demos a la segunda. Ésta, a su vez, nos lleva a la consideración de ciertas disposiciones constitucionales pertinentes a la controversia de autos. Veamos.

A. *El derecho constitucional de los empleados de Dolphin a escoger y renunciar libremente a su ocupación.*

■ Al redactar nuestra Constitución, los delegados a la Convención Constituyente le dieron cardinal importancia al área del derecho del trabajo y de los trabajadores. Así quedó evidenciado en la agenda de trabajo de la Comisión de Carta de Derechos. Como parte de sus labores, dicha Comisión celebró tres (3) vistas públicas, una de las cuales fue dedicada por completo al tema de los "derechos del trabajo". Resultado de esto es la Sec. 16 del Art. II de la Constitución del Estado Libre Asociado de Puerto Rico, *supra.*(4)

---

(4) "*Sec. 16. [Derechos de los Empleados]*

■ Esta sección establece el derecho de todo trabajador a escoger y a renunciar libremente a la ocupación a que quiera dedicarse. Tal derecho, a pesar de ser de rango constitucional, no es absoluto. Puede ser renunciado o limitado por el propio trabajador. Éste puede, mediante la celebración de un contrato, establecer las condiciones razonables de trabajo que regirán la relación obrero-patronal. Sin embargo, dicho contrato no puede ir contra lo establecido en las leyes protectoras del trabajo ni ser producto de una presión u opresión indebida por parte del patrono.

■ Del informe presentado por la Comisión de Carta de Derechos, en ocasión de discutir la propuesta Sec. 15 de dicha carta (hoy Sec. 16, Art. II, Const. E.L.A., *supra*), surge claramente que aunque no estamos ante un derecho absoluto, sí estamos ante uno de carácter fundamental, parte integral de una "declaración constitucional, de gran jerarquía. . .". *Martín Santos v. C.R.U.V,* 89 D.P.R. 175, 185 (1963). En lo pertinente, dicho informe dispuso lo siguiente:

> La Comisión subraya la alta dignidad del esfuerzo humano y destina esta sección al señalamiento de los derechos básicos del trabajador como tal. Coloca particular énfasis en aquel grueso de la clase trabajadora que por razón de especial desvalimiento históricamente ha necesitado, aunque no siempre ha recibido, protección social.
>
> *La primera cláusula subraya el carácter, libre y voluntario de todo trabajo. A nadie se puede imponer una tarea en contra de su voluntad; tampoco se pierde nunca el derecho a renunciar.* No quiere decir esto que el trabajador tenga derecho constitucional a rehusar llevar a cabo parte de su labor y continuar, no obstante, detentando determinado empleo en violación· de los términos de su contrato. Las condiciones de trabajo quedan normalmente convenidas de antemano en forma bilateralmente obligatoria y tendrán

---

"*Se reconoce el derecho de todo trabajador a escoger libremente su ocupación y a renunciar a ella,* a recibir igual paga por igual trabajo, a un salario mínimo razonable, a protección contra riesgos para su salud o integridad personal en su trabajo o empleo, y a una jornada ordinaria que no exceda de ocho horas de trabajo. Sólo podrá trabajarse en exceso de este límite diario, mediante compensación extraordinaria que nunca será menor de una vez y media el tipo de salario ordinario, según se disponga por ley." (Énfasis suplido.) Art. II, Sec. 16, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 327.

mayor o menor amplitud con arreglo a su particular naturaleza. (Énfasis suplido.) 4 Diario de Sesiones de la Convención Constituyente 2573–2574 (1951).

De otra parte, en *Gen. Office Prods. v. A.M. Capen's Sons,* supra, pág. 558, resolvimos "que el Artículo 1802 del Código Civil de Puerto Rico permite . . . la acción por interferencia culposa con las obligaciones contractuales de terceros". Señalamos allí que dicha acción es aplicable a pactos de exclusiva pero que, sin embargo, "[h]ay situaciones en las que no se da, mas ello ocurre mayormente cuando intereses públicos de alto rango lo impiden". (Énfasis suplido.) Íd. Señalamos como los elementos constitutivos de la causa de acción los siguientes: *Primero*: la existencia de un contrato con el cual interfiera un tercero. Si lo que se afecta es una expectativa o una relación económica provechosa sin que medie contrato, la acción no procede. *Segundo*: que medie culpa. Basta con que el perjudicado pruebe o presente hechos que permitan inferir que el tercero actuó intencionalmente, con conocimiento de la existencia del contrato. *Tercero*: que se haya ocasionado un daño al actor. *Cuarto*: que el daño sea consecuencia de la actuación culposa del tercero. Estos requisitos son de carácter copulativo. Expusimos, además, que la responsabilidad del que interfiere con el contrato es solidaria con la responsabilidad del contratante que lo inejecuta a sabiendas.

En su sentencia parcial el tribunal de instancia, al aplicar la doctrina de interferencia culposa antes reseñada, concluyó, como cuestión de derecho, "'que la anterior teoría de derecho es aplicable incluso al industrial, que sonsaca a un trabajador especializado de la factoría donde presta sus servicios, ofreciéndole mejor remuneración . . .'".[5] Fundamentó su dictamen sobre la norma que rige en España.

En el caso de autos, sin embargo, no podemos optar por la fórmula civilista española. En material de derecho laboral, el enfoque de la legislación española ha sido completamente distinto al nuestro. Contrario al nuestro, allí no se dispone ni se permite

---

[5] Apéndice A, pág. 7.

que un trabajador pueda renunciar libremente a su ocupación. El contrato de trabajo español recibe un tratamiento parecido al que se sigue con los contratos civiles en general. Al comentar sobre el particular, Hernainz Márquez nos apunta lo siguiente:

> ¿Puede terminar el contrato de trabajo por la simple voluntad de una sola de las partes? La doctrina de la Ley, exponiendo causas determinadas que justifiquen la cesación de la relación de trabajo bien por el empresario o bien por el trabajador, parece indicar la repugnancia a aceptar el fin de este contrato por el simple deseo de uno solo de los que en él intervienen. Las tendencias imperantes sobre dicha relación también parecen un tanto opuestas a dicha cesación unilateral, en beneficio tanto del trabajador como de la empresa y del supremo interés nacional.
>
> . . . . . . . . . .
>
> . . . Aún más: entendemos que así como el despido injustificado del trabajador por parte del empresario origina una sanción para éste, así también en determinados casos en que el abandono injustificado del trabajo suponga un evidente perjuicio para la empresa debía ser específicamente sancionado. M. Hernainz Márquez, *Tratado elemental de derecho del trabajo*, 12ma ed., Madrid, Inst. de Estudios Políticos, 1977, Vol. I, págs. 459–460 y 461.

Como vemos, no sólo desfavorece el derecho laboral español la renuncia a su empleo por parte del trabajador, sino que, en aquellos casos en que éste termine su relación laboral por razones distintas a las establecidas como justificadas en las leyes del trabajo de esa nación, está sujeto a ser sancionado.

■ Al plantearnos el asunto de la interferencia culposa con las obligaciones contractuales en el área de las relaciones obrero-patronales, no podemos perder de vista el desarrollo particular de nuestro sistema de derecho laboral. De acuerdo con éste, en ausencia de un contrato donde el trabajador específicamente y bajo condiciones razonables abdique a su derecho constitucional a escoger su ocupación o a renunciar en cualquier momento y por cualquier razón a ésta, tal actuación no puede acarrearle la imposición de sanciones de tipo alguno.

De la prueba desfilada en el caso de autos surge que los empleados codemandados Elba Meléndez y Alejo Rivera no tenían contrato escrito con la demandante Dolphin. Tampoco

estaban sujetos a pactos restrictivos o de no competencia ni a compromiso alguno de permanecer en sus empleos por un período determinado o a no ocupar empleos análogos una vez renunciasen. Sus empleos eran a tiempo indeterminado, terminables a voluntad. De los autos y expediente tampoco surge que el otro codemandado, Joseph D'Bella, estuviera sujeto a un contrato escrito con la demandante Dolphin. Por el contrario, estaba trabajando en las mismas condiciones que sus compañeros codemandados.(6)

Le asiste la razón a los demandados recurrentes cuando señalan que erró el tribunal de instancia al negarse a desestimar la reclamación contra los empleados codemandados. Éstos podían renunciar en cualquier momento y por cualquier razón, aun sin notificación previa de su renuncia. Al así hacerlo, no están sujetos a responderle en daños y perjuicios a su patrono por la acción tomada.(7)

Ahora bien, pasemos a analizar la interrogante de si incurre o no en responsabilidad la empresa o patrono que solicita de un trabajador con empleo a tiempo indeterminado la terminación de su relación laboral existente con otro patrono con el propósito de emplearlo.

## B. *La interferencia de Ryder con las obligaciones contractuales de Dolphin y sus empleados*

Según se desprende de la exposición que hemos hecho, debido a las diferencias entre la doctrina laboral española y la nuestra, el problema que confrontamos requiere una solución ecléctica. Los postulados civilistas en materia de interferencia culposa y el enfoque angloamericano, más afín al desarrollo de nuestro sis-

---

(6) Del Informe sobre Conferencia Preliminar entre abogados surge que las partes estipularon lo siguiente:

"Que entre la parte demandante y los co-demandados Joseph D' Bella, Elba Meléndez y Alejo Rivera no existía un contrato escrito que exigiera que éstos tuvieren un término fijo de empleo." Informe, pág. 8.

(7) De haber estado vinculados los empleados por los acuerdos de un contrato a término fijo, el renunciar antes del vencimiento de dicho contrato los sujetaría a una acción por incumplimiento del mismo, no a una en daños por interferencia culposa bajo las disposiciones del Art. 1802 del Código Civil, 31 L.P.R.A. sec. 5141.

tema de derecho laboral, deben ser atemperados a nuestra realidad jurídica de manera racional y ponderada mediante la inclusión y utilización de normas de derecho autóctonas.

De acuerdo con la doctrina angloamericana, en su origen la acción por interferencia culposa con las obligaciones contractuales suponía la existencia de un contrato.[8] El desarrollo posterior de la misma extendió el principio a la interferencia con las relaciones económicas provechosas o ventajosas, aun cuando éstas no hayan sido afianzadas mediante la celebración de un contrato. W.P. Keeton, *Prosser and Keeton on Torts,* 5ta ed., Minnesota, Ed. West Publishing Co., 1984, pág. 981.

Generalmente, se le impone responsabilidad aquiliana a aquel que, de forma "impropia" e intencional, interfiere con los derechos que surgen de las relaciones contractuales del perjudicado con otras personas si dicha interferencia le ocasiona daños a éste. También podría imponérsele responsabilidad a quien interfiere con las proyecciones de beneficio económico del perjudicado, aun cuando éstas no se hayan reducido a escrito mediante el otorgamiento de un contrato. No obstante, en los casos de meras proyecciones la responsabilidad no se impone livianamente. Keeton, *op. cit.,* pág. 978.

Bajo la casuística angloamericana, la llamada interferencia "impropia" fue descrita originalmente como "maliciosa" (culposa). Esta terminología, sin embargo, está cayendo en desuso y la responsabilidad ahora se centra más bien en el propósito con que actúa el demandado, no ya en una expresión vaga e indefinida como "impropia" o "maliciosa".[9] Keeton, *op. cit.,* pág. 979.

En nuestra jurisdicción hemos establecido que, como requisito indispensable para iniciar una acción por interferencia culposa, debe existir un contrato con el cual interfiera un tercero.

---

[8] Véanse los casos de *Lumley* v. *Gye,* 2El. & Bl. (Eng.) 216, 118 (1853), y su progenie.

[9] Cabe señalar que la acción por interferencia culposa ha sido vista con grandes sospechas y reservas debido a que, en sus orígenes, se utilizó como instrumento para lograr el trabajo compulsorio, y más recientemente como un medio para suprimir las uniones obreras. W.P. Keeton, *Prosser and Keeton on Torts,* 5ta ed., Minnesota, Ed. West Publishing Co., 1984, pág. 979.

No procede la acción cuando lo que se afecta es una mera expectativa o una relación económica provechosa. *General Office Prods. v. A.M. Capen's Sons,* supra. En cuanto al asunto particular que hoy nos ocupa, adoptamos este postulado de nuestro derecho civilista, distinto al de la doctrina angloamericana. Para que pueda iniciarse la acción por interferencia culposa contra el segundo patrono no sólo debe existir un contrato, sino que éste sea a término fijo.

▪ De ordinario, la interferencia culposa presupone el conocimiento de la existencia del contrato y el derecho del perjudicado, o al menos de los hechos que lleven a un hombre prudente y razonable a creer que dicha relación existe. Sin embargo, bajo la doctrina angloamericana se ha sostenido que un tercero puede interferir culposamente con las obligaciones contractuales del perjudicado, sin que se le imponga responsabilidad, si existen los fundamentos adecuados para permitir tal interferencia. En este sentido algunos tratadistas señalan que, si el tercero actúa con el fin de lograr un propósito legítimo, aunque al hacerlo actúe de manera culposa, su actuación se considerará una privilegiada y no se le impondrá responsabilidad si el propósito legítimo predomina sobre la conducta culposa. Keeton, *op. cit.,* págs. 983–984.

▪ De acuerdo con lo antes expuesto se ha resuelto que, cuando existe una relación obrero-patronal —u otra de índole similar la cual sea terminable a voluntad de las partes— la interferencia de un tercero con dicha relación estará cobijada por lo que los tratadistas norteamericanos han llamado la *"teoría del privilegio de la competencia"*. En los casos en que las relaciones contractuales son terminables a voluntad, no es necesario determinar la presencia de un propósito legítimo que predomine sobre la conducta culposa a los fines de no imponer responsabilidad. En estos casos simplemente se aplica el privilegio, como veremos a continuación:

> Where the contract interfered with is terminable at will, however, the privilege of competition has been recognized. In such a case there is no contract right to have the relation continued, but only an expectancy, which is similar to the expectancy of a business that a

customer will continue to do business with it. With such an expectancy of future relations, and prospective advantage, there has been no doubt that a competitor has the privilege of interfering to acquire the business for himself. *Accordingly, the considerable weight of authority holds that there is a privilege of competition which extends to inducing the termination of agreements terminable at will, whether they concern employment or other relations.* (Citas omitidas y énfasis suplido.) Keeton, *op. cit.*, págs. 987–988. Véanse, además: *Triangle Film Corp. v. Artcraft Pictures Corp.*, 250 F. 981 (1918); *Orkin Exterminating Co. v. Martin Co.*, 242 S.E.2d 135 (1978).

Esta teoría ha sido expuesta de la manera siguiente:

The privilege of competition as here used means not only the privilege to invade interests in contract relations in protection or in furtherance of the interest to enter into trade or employment relations but also the defense of self-interest in the economic struggle in trade and employment relations. The interest of labor to better itself in respect to conditions, hours, wages and, by some courts, even the strengthening of the labor union itself for the accomplishing of these ends, is embraced within this privilege. Competition gives a privilege to invade interests in all cases of contracts terminable at will. (Citas omitidas.) C. Carpenter, *Interference with Contract Relations,* 41 Harv. L. Rev. 728, 754 (1928).

Al amparo de la *teoría del privilegio de la competencia,* en los casos de inexistencia de contratos a término fijo la relación contractual interferida adquiere las dimensiones de una expectativa, a lo sumo, de una relación económica provechosa. Tal relación no es suficiente para dar inicio a una acción por interferencia culposa con las relaciones contractuales de terceros. *Gen. Office Prods. v. A.M. Capen's Sons,* supra.

Aplicando las normas de derecho antes reseñadas al caso de autos, encontramos que el tribunal a quo erró al imponerle responsabilidad al codemandado Ryder. Los empleados codemandados tenían la libertad de terminar su relación de empleo con Dolphin a voluntad. Ryder, a su vez, les ofreció a estos

empleados trabajo en su negocio —uno legítimo— similar a las operaciones que llevaba a cabo la demandante Dolphin.(10)

Por otro lado, dadas las circunstancias particulares de este caso, de imponérsele responsabilidad a Ryder estaríamos menoscabando colateralmente el derecho constitucional que tiene todo trabajador a renunciar y escoger libremente su ocupación. Los patronos estarían menos dispuestos a brindarle oportunidades de empleo, mejores o iguales, a un trabajador si saben que esta acción podría acarrearles la imposición de sanciones. Además, por tratarse de un derecho constitucional fundamental no renunciado, estamos ante una situación en que "intereses públicos de alto rango" impedirían que pueda ejercitarse la acción por interferencia culposa con las obligaciones contractuales. *Gen. Office Prods. v. A.M. Capen's Sons,* supra.(11)

---

(10) Por no ser pertinente ni necesario para la solución de este caso, no discutiremos aquí los supuestos en que se impondría responsabilidad a un patrono que interfiera con las obligaciones contractuales de otro patrono con sus empleados, cuando dicha relación no es una terminable a voluntad.

"But in contracts not terminable at will we must differentiate the cases where the defendant acts for the specific purpose or with desire of invading, or knows that the end he seeks to accomplish in itself constitutes an invasion of the plaintiff's contract interests, from the cases where the act is done for a purpose other than a desire to invade, although an invasion incidentally and indirectly results from the acts done. Competition gives no privilege to invade in the former while it does in the latter group of cases." (Citas omitidas.) C. Carpenter, *Interference with Contract Relations,* 41 Harv. L. Rev. 728, 754 (1928).

No obstante, es esencial tener presente al momento de decidir si se le impone o no responsabilidad al patrono que interfiere con la relación contractual, el impacto que tendría la imposición de dicha responsabilidad al tomar en consideración la disposición constitucional que garantiza a todo trabajador el derecho a escoger y renunciar libremente a su ocupación. Art. II, Sec. 16, Const. E.L.A., *supra.*

(11) En *Gen. Office Prods. v. A.M. Capen's Sons,* 115 D.P.R. 553 (1984), señalamos, sin discutirla, la figura del contrato en daño de tercero como una afín a la de interferencia culposa. Posteriormente, en *Dennis, Metro Invs. v. City Fed. Savs.,* 121 D.P.R. 197 (1988), tuvimos la oportunidad de analizar este tipo de contrato y establecer sus dimensiones. Allí señalamos que "[p]ara que exista un contrato en daño de tercero es necesario que se den los requisitos siguientes: (1) que haya un tercero afectado; (2) que se haya causado un daño a esa tercera persona; (3) que medie un nexo causal entre el daño y el contrato, y (4) que medie la intención de causar daño, ya sea de ambos contratantes o de uno solo de ellos". *Dennis, Metro Invs. v. City Fed. Savs.,* supra, pág. 212.

La relación contractual establecida entre Ryder y los ex empleados de Dolphin no le causó daño a ésta. En *Dennis, Metro Invs. v. City Fed. Savs.,* supra, pág. 213, señalamos, citando a Diez-Picazo, lo siguiente:

"'[U]n "daño" es una lesión o violación de un concreto derecho subjetivo. No hay por ello daño de terceros si simplemente son colocados en situación desfavorable intereses que no son especialmente protegidos'."

 En resumen, de acuerdo con el análisis doctrinal que antecede, concluimos que no procede imponer responsabilidad por interferencia culposa por renunciar a sus trabajos a los empleados bajo contrato sin término fijo. Resolvemos, además, que como norma general en aquellos casos en que un patrono solicite que los empleados de otro patrono terminen su relación laboral con éste con el propósito de obtener sus servicios, si la relación contractual con la que se interfiere es una terminable a voluntad de las partes, el tercero que interfiere no será responsable en una acción en daños y perjuicios por interferencia culposa.[12]

Los primeros tres (3) errores señalados se cometieron. En vista de lo anterior, no es necesario discutir los señalamientos de error cuarto y quinto.

## III

*La desestimación de la reconvención*

En la reconvención los demandados alegaron básicamente dos (2) causas de acción:

2. Dolphin le ha causado a los demandados serios daños y perjuicios con motivo de haber instituído [sic] un pleito malicioso y de haber dado conocimiento del mismo a terceros, con lo cual le ha ocasionado a los demandados serios daños a su reputación y prestigio que se estiman razonablemente en la suma de $1,000,000.00.

3. Dolphin incumplió sus obligaciones para con Ryder y/o descargó las mismas en forma negligente.

4. Como consecuencia del incumplimiento y/o negligencia en que incurrió Dolphin se afectaron los negocios de Ryder y ésta sufrió

---

En el caso de autos, los codemandados podían renunciar a su empleo con Dolphin en cualquier momento y por cualquier razón. Dolphin no tenía derecho a exigir que sus empleados continuaran trabajando para ella. Por lo tanto, la relación laboral concertada entre éstos y Ryder no lesionó derecho alguno de Dolphin. Una vez determinado que no se causó daño, no es necesario continuar con el análisis de los restantes requisitos.

[12] No obstante, el patrono podría estar sujeto a responder si con su actuación causa daños relacionados con los secretos del negocio, patentes y asuntos similares. Esto se hará teniendo presente que, en los casos en que proceda, la responsabilidad impuesta al tercero no puede convertirse en mecanismo colateral para menoscabar el derecho constitucional de todo trabajador a escoger y renunciar libremente a su ocupación.

daños que conservadoramente se calculan en la suma aproximada de $500,000.00. Apéndice F, pág. 28.

El tribunal de instancia desestimó la reconvención en su totalidad, aduciendo que la parte demandada "no presentó prueba alguna para sostener sus alegaciones". Sentencia sumaria, pág. 8.

Ahora bien, al señalar la vista en su fondo, el foro de instancia dictó una orden en la cual indicó específicamente que la vista se efectuaría con el propósito de "determinar la responsabilidad de la parte demandada". Apéndice H. Los demandados recurrentes alegan que de la orden se desprendía "[c]laramente [que] no era el propósito de dicha vista desfilar prueba sobre las alegaciones contenidas en la reconvención" (Alegato de los recurrentes, pág. 37) y que por esta razón no presentó prueba alguna tendente a demostrar la responsabilidad de Dolphin.

Les asiste la razón en cuanto a la segunda causa de acción, contenida en los acápites tres (3) y cuatro (4) de la reconvención. No así en cuanto a la primera.

█ Dolphin no instó en contra de los demandados un pleito malicioso ni inmeritorio. Prueba de ello es que, al revocar a instancia, estamos pautando normas en un área nueva. Tampoco les asiste la razón al alegar que dar a conocer de la demanda a terceros les ocasionó graves daños a su reputación. La demanda es un documento público, susceptible de ser conocido por quien desee inspeccionarlo. Ahora bien, debido a que la primera causa de acción de la reconvención, expuesta en el acápite dos (2), está directamente relacionada con la reclamación contenida en la demanda, al señalarse la vista en los méritos para la reclamación original se sobreentendía que se dilucidaría también la primera causa de acción incluida en la reconvención. Nada impide, pues, que al disponer de la reclamación del demandante se disponga de la primera causa de acción de los demandados reconvinientes.

En cuanto a la segunda causa de acción (acápites tres (3) y cuatro (4) de la reconvención presentada), ésta no debió

desestimarse. Es una reclamación independiente y, como tal, debió haber sido considerada.[13]

Erró el tribunal de instancia al desestimar la segunda causa de acción de la reconvención. El sexto error fue cometido sólo en cuanto a lo aquí señalado.

## IV

Por todo lo antes expuesto, *se dictará sentencia para revocar en parte la sentencia parcial recurrida emitida por el Tribunal Superior de Puerto Rico, Sala de Carolina, el 10 de abril de 1985, en cuanto ésta le impone responsabilidad a la codemandada Ryder y desestima en su totalidad la reconvención, y se devuelve el caso para procedimientos ulteriores compatibles con lo resuelto en esta opinión.*

El Juez Asociado Señor Negrón García emitió opinión disidente.

— O —

Opinión disidente del Juez Asociado Señor Negrón García.

"Un Código es un conjunto de reglas que la moral sanciona; eliminad de los textos la buena fe y será un conjunto de ganzúas." Virgilio De Sa Pereira, *Direito de Familia*, (1923) pág. 222.

ESTE DISENSO SE INSPIRA, PUES, EN LA OMNIPRESENCIA DE LA BUENA FE EN NUESTRO SISTEMA DE DERECHO. Y es que la buena fe como principio programático, modelo de comportamiento, o arquetipo de conducta, *no* es nuevo. "[D]on Manuel González Rodríguez, dice, al comenzar su magnífico boceto jurídico sobre 'La buena fe y la seguridad jurídica', que 'la buena fe es un elemento jurídico primario que se intuye más

---

[13] No estamos, por no ser necesario ni estar planteado, pasando juicio sobre la suficiencia de esta alegación ni los méritos de la misma.

que se define'. La fijación de concepto jurídico de la buena fe (en adelante b. fe) es algo que ha traído y sigue trayendo por la calle de la amargura a multitud de juristas, resultando encarecida la dificultad de la cuestión por el hecho de que la b. fe no es, precisamente, un elemento jurídico moderno, sino uno de los elementos jurídicos más antiguos que se conoce, y que, en cierta medida, *es común a la Moral y al Derecho.*" J.A. Molleda Fernández Llamazares, *La Presunción de Buena Fe,* Madrid, Ed. Rev. Der. Privado, 1962, T. I, págs. 187–188.

Así honramos nuestros pronunciamientos en *Reyes v. Sucn. Sánchez Soto,* 98 D.P.R. 305, 312 (1970), de que la "convivencia social ordenada impone un deber general de corrección y de prudencia en relación con los demás ciudadanos, y el acto es ilícito en el sentido extracontractual cuando viola 'los deberes generales de corrección social o de conducta correcta, deberes que no están escritos en los códigos pero que representan el presupuesto mínimo sobreentendido del orden de la vida social'". (Énfasis suprimido.)

Como veremos, en el caso de autos la conducta de uno de los protagonistas transgredió el deber que impone la convivencia ordenada, y el daño causado por sus actos exigía el remedio jurídico del Art. 1802 del Código Civil, 32 L.P.R.A. sec. 5141, como "infractor de ese deber social por acto de su culpa o de su negligencia". (Énfasis suprimido.) *Reyes v. Sucn. Sánchez Soto,* supra, pág. 313.

## I

En enero de 1978, Dolphin International of Puerto Rico, Inc. (Dolphin) y Ryder Truck Lines, Inc. (Ryder) acordaron verbalmente iniciar una relación comercial en la cual Dolphin actuaría como agente de Ryder en Puerto Rico.[1] Dolphin estaría encar-

---

[1] Dolphin International of Puerto Rico, Inc. (Dolphin) se dedica al negocio de recibir, almacenar y entregar mercancía en furgones provenientes de Estados Unidos.

Ryder Truck Lines, Inc. (Ryder) es una corporación organizada bajo las leyes del estado de Florida, debidamente autorizada para hacer negocios en Puerto Rico.

gada de recibir los furgones que enviaban los clientes de Ryder desde diferentes puntos de Estados Unidos, descargarlos, notificar a los consignatarios y hacer los arreglos para su entrega.

Con motivo de esta relación, Dolphin le cedió a Ryder en arrendamiento un espacio para oficina localizado dentro de sus facilidades físicas. Allí trabajaba esporádicamente un vendedor de Ryder que gestionaba y mercadeaba sus ventas en la isla.

Así las cosas, el 26 de junio del mismo año Larry Porter, director de la división del Caribe de Ryder, notificó a la gerencia de Dolphin que Ryder contemplaba establecerse por su cuenta en Puerto Rico y, por tal razón, desde ese momento prescindían de sus servicios.

Tres (3) días antes, Elba Meléndez y Alejo Rivera habían presentado sus cartas de renuncia. Joseph D'Bella, quien ocupaba la posición de Gerente, hizo lo mismo un día después. Todos habían trabajado varios años con Dolphin y sus renuncias obedecían al deseo de aceptar las ofertas de trabajo que Ryder les hiciera.

El 12 de junio de 1979, Dolphin demandó en el Tribunal Superior, Sala de San Juan, a Ryder y a cuatro (4) de sus ex empleados.(2) En síntesis, alegó que Ryder intervino con la relación contractual existente entre Dolphin y sus entonces empleados, motivando que éstos renunciaran a sus respectivos puestos para ir a trabajar con Ryder. Esto, según señaló, ocasionó daños irreparables a su empresa. Sostuvo, además, que todos conspiraron entre sí para sacarla del mercado competitivo y lograr que perdiera su clientela.(3)

Ryder contestó y negó responsabilidad. Además, reconvino. Reclamó un millón de dólares ($1,000,000) por alegados daños a su reputación y prestigio por la presentación de un pleito malicioso y su divulgación a terceros.

---

(2) Joseph D'Bella, Elba Meléndez, Alejo Rivera y Mildred Arroyo. Esta última nunca fue emplazada y Dolphin desistió voluntariamente de su demanda contra ella.

(3) Reclamó $250,000 por los daños alegadamente sufridos y $50,000 por los gastos de entrenamiento del nuevo personal que se vio obligada a reclutar.

A solicitud de las partes, el tribunal dilucidó el aspecto de responsabilidad; resolvió contra Ryder. Concluyó que su intervención con la relación contractual entre Dolphin y sus ex empleados fue llevada a cabo "con pleno conocimiento de las consecuencias que esto tendría para la corporación demandante". Sentencia sumaria, pág. 5. Revisamos.

## II

La sentencia del tribunal de instancia, aunque por distintos fundamentos, debe prevalecer. Después de todo, toda revisión se da contra el dictamen y no sus fundamentos. *Sánchez v. Eastern Air Lines, Inc.*, 114 D.P.R. 691, 695 (1983); *Collado v. E.L.A.*, 98 D.P.R. 111, 114 (1969); *Rodríguez v. Serra*, 90 D.P.R. 776, 777 (1964). Nos explicamos.

Dicho foro aplicó la doctrina establecida en *Gen. Office Prods. v. A.M. Capen's Sons*, 115 D.P.R. 553 (1984), al caso de autos que trata sobre contratos de trabajo sin término fijo ni pacto restrictivo en cuanto a empleo futuro con empresas competidoras. En lo pertinente, allí resolvimos que bajo el Art. 1802 del Código Civil, *supra*, procede una "acción por interferencia culposa con las obligaciones contractuales de terceros. *La acción se aplica a pactos de exclusiva como el presente. Hay situaciones en las que no se da, mas ello ocurre mayormente cuando intereses públicos de alto rango lo impiden*". (Énfasis suplido.) Íd., pág. 558.

Tal es el caso de autos. En una de sus dimensiones, el cuadro fáctico aquí presente está revestido de un interés público de alto rango, a saber, el derecho del trabajador puertorriqueño "a escoger libremente su ocupación y a renunciar a ella". Art. II, Sec. 16, Const. E.L.A., Tomo 1, ed. 1982, pág. 327. Esta "cláusula subraya el carácter, libre y voluntario de todo trabajo. A nadie se [le] puede imponer una tarea en contra de su voluntad; tampoco se pierde nunca el derecho a renunciar". 4 Diario de Sesiones de la Convención Constituyente 2574 (1951). La libertad de movilidad en el mercado de empleo obedece al marcado interés de los forjadores de nuestra Constitución en proteger la clase trabaja-

dora y darle la oportunidad de elevar su nivel de vida y el de su familia. Extender los pronunciamientos de *Gen. Office Prods. v. A.M. Capen's Sons*, supra, a empleos sin tiempo determinado ni pactos limitativos atentaría contra el diseño laboral constitucional y trastocaría los cimientos que apuntalan toda política pública y legislación en esa área. Bajo este enfoque, es obvio que no procedía la acción de Dolphin contra sus ex empleados.

## III

Lo expuesto no exime de responsabilidad a Ryder. Su actuación no se circunscribió a una simple oferta de trabajo a un empleado de una empresa competidora. La prueba directa y circunstancial revela un patrón de conducta doloso y de mala fe.[4] Ryder conoció la manera en que internamente operaba Dolphin. En virtud de ese conocimiento, reclutó a las cuatro (4) personas que tenían principalmente a su cargo la fase administrativa. La naturaleza de sus funciones permiten concluir que todos juntos constituían la piedra angular de la empresa. Por ende, la súbita y simultánea ausencia de éstos ocasionó un caos administrativo en el negocio de Dolphin. Razonablemente tuvo que prever los efectos negativos y detrimentales que ese éxodo de personal acarrearía.

Ryder era consciente de esta situación. Advino en conocimiento so sólo por tener a su vendedor en las facilidades de

---

(4) El concepto en este caso es en el plano corporativo. Ello no impide detectar institucionalmente una intención corporativa por los funcionarios de la corporación. Cobra vigencia entonces la necesidad del examen circunstancial:

"La intención es, en rigor, el estado mental que acompaña y determina la decisión de cometer un acto con el propósito, deseo o designio de producir un resultado; v.g., es el estado mental que acompaña y determina la elección consciente de un fin.

"Por tanto, la intención es un proceso secreto de la mente humana que no es susceptible de conocimiento cierto por parte de otras personas. *Siendo esto así, para probar la intención es indispensable recurrir a la prueba circunstancial. La conducta del actor, su presunto conocimiento, percepción y consciencia de las relaciones de causas y efectos son elementos de prueba, piezas de evidencia, de las cuales se puede inferir su intención*, ya que la ley presume que toda persona intenta las consecuencias naturales y probables de sus actos, conforme a las circunstancias particulares que enmarcan el evento y de las que el actor está consciente." (Énfasis suplido.) H. Brau del Toro, *Los daños y perjuicios extracontractuales en Puerto Rico*, 2da ed., San Juan, Pubs. J.T.S., 1986, Vol. 1, pág. 81.

Dolphin, sino porque así lo exigía la naturaleza de la relación comercial de principal y agente que existía entre ambas entidades. Además, Ryder se dedicaba a este mismo tipo de negocio en Estados Unidos y conocía a perfección el personal clave que una operación independiente precisaba.

No podemos tolerar impunemente este tipo de conducta que propiciaría prácticas indeseables en el mundo comercial. En circunstancias análogas, cualquier empresa cuyo propósito fuese acaparar el mercado podría utilizar este método para causar perjuicios o sacar del comercio a sus competidores. Los efectos serían particularmente devastadores para el pequeño comerciante debido a su inhabilidad para equiparar el salario, condiciones de trabajo y otros beneficios marginales que ofrecen empresas con un volumen de negocio mucho mayor.

Aunque nunca se redujo a escrito, sí existía un contrato verbal mediante el cual las partes acordaron entrar en esta relación comercial. Su validez y efecto vinculante no se cuestionan.

Irrespectivamente de su tipicidad —fuera agencia, mandato o comisión mercantil— ello configuraba una relación de carácter fiduciario en el cual estaba subyacente un alto grado de confianza recíproca.

Esta confianza es la clave que sirve de base a toda actividad humana exitosa. La interdependencia entre los seres humanos —al actuar en su carácter personal o corporativo— y las normas de convivencia social así lo exigen. No debe menoscabarse a través de actuaciones como la de autos.

La crisis provocada por Ryder pudo y debió haberse evitado. Dada la relación entre las partes en este caso, los más elementales principios de la buena fe y el juego limpio requerían, como mínimo, que con suficiente anticipación notificara a Dolphin de su interés en reclutar dichos empleados. De esa forma, Dolphin hubiese podido evaluar las ofertas hechas a sus empleados y tratar, dentro de sus posibilidades económicas, de igualarlas o mejorarlas para retenerlos. En la alternativa, hubiese podido iniciar con tiempo las gestiones necesarias para reclutar y entrenar nuevo personal que los sustituyera.

La conducta de Ryder es incompatible con la buena fe. No hubo ningún esfuerzo positivo de su parte para evitar las consecuencias de sus actos.

> Será "de buena fe" aquel que haya actuado siguiendo las reglas de honestidad y corrección, cumpliendo las normas que impone el principio general de buena fe. Se nos dirá, entonces, que "ser de buena fe", de acuerdo con esta tesis, sólo es posible cuando el ordenamiento impone concretamente la obligación de conducirse de tal modo. No es así; la obligación de comportarse según las normas de la buena fe surge de un principio general básico en todo ordenamiento, esté o no expresamente recogido. En líneas generales el contenido de la buena fe como principio general tiene una marcada carga ética, representa una forma de irrupción o conexión entre la moral social y el Derecho. D.M. Ferreira Rubio, *La buena fe: el principio general en el derecho civil*, Madrid, Ed. Montecorvo, 1984, pág. 95.

En Puerto Rico, nuestra jurisprudencia ha dado ya pasos firmes para afianzar la buena fe como "exigencia general de nuestro derecho y que como tal se extiende a la totalidad de nuestro ordenamiento jurídico. El contenido de eticidad de cada acto deberá examinarse a la luz de sus circunstancias particulares, pero el comportamiento conforme a la buena fe es precepto general que abarca toda actividad jurídica". *Velilla v. Pueblo Supermarkets, Inc.*, 111 D.P.R. 585, 587–588 (1981); *Catalytic Ind. Maint. Co. v. F.S.E.*, 121 D.P.R. 98 (1988); *Ramírez v. Club Cala de Palmas*, 123 D.P.R. 339 (1989). Véanse, también: *Berríos v. U.P.R.*, 116 D.P.R. 88 (1985); M.J. Godreau, *Lealtad y Buena Fe Contractual*, 58 (Núm. 3) Rev. Jur. U.P.R. 367 (1989).

El ámbito del comercio y el derecho mercantil no son excepción a estos postulados. La buena fe penetra en estas áreas y exige que la conducta de las personas se guíe por las normas de convivencia social que rigen en nuestra sociedad. "[L]a Etica . . . no quiere renunciar a dictar sus normas justamente en el terreno más comprometido y más arriesgado para ella, a saber, en el campo de la competencia mercantil, donde a diario se ventila el combate para conseguir el mayor lucro económico." Garrigues, *Temas de Derecho Vivo*, Madrid, Ed. Tecnos, 1978, pág. 209.

El concepto de la buena fe no es estático. No cabe una definición universal. Su alcance habrá de determinarlo el juzgador en virtud de un análisis valorativo de los hechos ante sí.

El proceso que hemos venido describiendo, es decir el de fijación del contenido de la buena fe es un proceso previo a la aplicación de la norma. La buena fe en sí misma, es un criterio normativo, pero ya dijimos que su formulación técnica es indeterminada, por eso para lograr normas un poco más concretas el intérprete debe realizar esta labor de valoración. Una vez cumplida esta ardua tarea de fijación de contenido, la norma de la buena fe actúa como cualquiera otra norma, en el proceso de actualización del Derecho.

. . . . . . . .

Todo este proceso de determinación de contenido no es consciente —por lo menos en la mayoría de los casos—. El intérprete quizá no se percata de que está dotando de contenido a un criterio indeterminado; que lo está haciendo mediante valoraciones; que éstas van referidas a los valores éticos vigentes; que de la moralidad sólo toma en cuenta una faceta; que la zona ética que ingresa está seleccionada en función de unos valores jurídicos, etc. Lo más frecuente es que el intérprete "intuya" lo que la buena fe exige, porque "cualquiera sabe qué es la buena fe", o mejor dicho "todos saben lo que significa comportarse de acuerdo a la buena fe". Ferreira Rubio, *op. cit.*, págs. 136–137.

*En resumen, la intención de Ryder de ocasionar daños a Dolphin surge del examen de las circunstancias que rodean el caso. No actuó de buena fe.* La situación provocada era previsible y no se hizo nada para evitar sus consecuencias.

De la misma manera no puede hablarse de que hay una conducta conforme a la buena fe, un actuar recto y honesto en su mera exterioridad, si esa conducta va acompañada de mala fe subjetiva. La conducta del hombre de Derecho no es una mera sucesión de actos sin importar el componente intelectual-volitivo.

. . . . . . . .

La conducta del hombre en el ámbito jurídico no es exclusiva exterioridad, sino acto. En consecuencia, no puede pretenderse que pueda haber una buena fe creencia sin una conducta conforme a la buena fe, ni la corrección y rectitud que exige la buena fe es una formalidad externa, vacua de contenido. Ferreira Rubio, *op. cit.*, pág. 97.

## IV

Los restantes errores giran en la órbita evidenciaria y procesal. En cuanto al aspecto evidenciario, Ryder se queja de que se le excluyó prueba pertinente en los extremos siguientes: (a) mala situación económica por la que supuestamente atravesaba Dolphin; (b) la fuga de clientes motivada por el mal servicio que prestaba, y (c) usos y costumbres en la industria de la transportación.(5)

La Regla 18 de Evidencia gobierna la situación. Dispone:

(A) Excepto cuando de otro modo se disponga por ley o por estas reglas, toda evidencia pertinente es admisible. Evidencia no pertinente es inadmisible.

(B) Evidencia pertinente es aquella tendente a hacer la existencia de un hecho más probable o menos probable de lo que sería sin tal evidencia; dicho hecho debe a su vez, referirse a una cuestión en controversia o a la credibilidad de algún testigo o declarante. 32 L.P.R.A. Ap. IV, R. 18.

El profesor Chiesa explica que "decir que una evidencia es pertinente es decir que tiene el mínimo valor probatorio que justifica que se reciba como un elemento de prueba. Pero sostener que una evidencia tiene ese mínimo valor probatorio implica un juicio lógico relativo al asunto que se quiere probar mediante tal evidencia. Dicho asunto deberá referirse a una cuestión en controversia o a la credibilidad de un testigo o declarante". E.L. Chiesa, *Práctica Procesal Puertorriqueña: Evidencia,* San Juan, Pubs. J.T.S., 1985, Vol. I, pág. 59. Véase, también, E.W. Cleary,

---

(5) Durante el testimonio del señor Porter no se admitió prueba en relación con la situación económica de Dolphin. Tampoco se admitió que respondiera a la pregunta de si conocía de algún uso o costumbre dentro de la industria de la transportación de carga que desalentase el cambio de empleo de los empleados en dicha industria.

Más tarde, el tribunal excluyó parte del testimonio de Elba Meléndez referente a la fuga de clientes de Dolphin.

Finalmente, por ser prueba de referencia, se eliminó todo lo declarado por el codemandado Alejo Rivera relativo a la falta de fondos en las cuentas de Dolphin. Esta situación, según atestó Rivera, no le permitió cobrar su cheque en algunas ocasiones.

Realmente esta prueba sería pertinente para la segunda etapa del proceso: evaluación de los daños de Dolphin.

*McCormick on Evidence,* 3ra ed., Minnesota, Ed. West Publishing Co., 1984, Sec. 185, pág. 541.

Bajo esta óptica, ciertamente las razones que pudieron haber tenido los empleados para abandonar sus puestos en Dolphin era un asunto central que estaba en controversia. A esos efectos Ryder intentó traer prueba para demostrar que no hubo interferencia con la relación contractual entre Dolphin y sus empleados, sino que la verdadera motivación fue una de índole puramente económica. La posibilidad de que Dolphin atravesara por una mala situación económica y ello provocara sus renuncias era prueba pertinente. Sin embargo, el error, aunque cometido, no fue perjudicial (*harmless error*). Veamos.

La señora Meléndez testificó que no hubiese abandonado a Dolphin a no ser por la tentadora oferta que le hicieran. Tomó la decisión pensando en un mejor futuro para ella y su familia.

Rivera, por su parte, declaró que se fue de Dolphin porque allí se sentía inseguro y en Ryder le ofrecieron un mejor puesto. Pensó que Ryder era lo mejor para su bienestar y el de sus hijos, ya que él era la única persona que aportaba dinero a su hogar. De su testimonio no se desprende ningún indicio de que anteriormente hubiese hecho gestiones de empleo en otro lugar. Más bien aprovechó la oportunidad que se le presentó en el camino y aceptó una buena oferta de trabajo.

Salvo el testimonio del señor Rivera sobre las dificultades ocasionales para cobrar su cheque —situación que, por la forma en que se verbalizó, fue excluida como prueba de referencia— la evidencia mencionada, aunque pertinente y admisible, no hubiese variado el resultado sobre responsabilidad de Ryder. De hecho, afianza su mala fe. De los testimonios de Rivera y Elba Meléndez surge que, aunque la mala situación económica de Dolphin estuvo siempre en sus mentes al tomar la decisión, ello no fue la razón principal que les motivó a aceptar la oferta de Ryder. De no

haberse presentado esa oferta *no* hubiesen abandonado Dolphin aun bajo el supuesto de su alegada pobre situación económica.(6)

Al evaluar esta prueba a la luz de las circunstancias peculiares de la causa de acción de Dolphin, resolvemos que su exclusión constituyó un error no perjudicial. De haberse admitido no hubiese variado sustancialmente las resultancias del pleito en cuanto a responsabilidad. Véanse: *S.J. Credit, Inc. v. Ramírez*, 113 D.P.R. 181, 190–191 (1982); Regla 5 de Evidencia, 32 L.P.R.A. Ap. IV; Chiesa, *op. cit.*, págs. 8–9.

Réstanos examinar los señalamientos procesales. Ryder protesta de la desestimación de su reconvención. Aduce que se señaló vista para determinar la responsabilidad *de la parte demandada* únicamente. El planteamiento es inmeritorio. La causa de acción de Ryder estaba inexorablemente atada al destino de la demanda de Dolphin. Únicamente bajo el supuesto de que ésta no prosperara podía entonces el tribunal entrar a dilucidar y evaluar los méritos de la reconvención.

Finalmente, Ryder cuestiona ciertas determinaciones de hecho del tribunal de instancia. Nos expone que las mismas no tienen apoyo en la prueba y están fundamentadas en el alegato de Dolphin. En su correcta perspectiva, el señalamiento no tiene el alcance pretendido. Aunque en algunas de sus determinaciones el foro de instancia usó un lenguaje abarcador, ello no altera la corrección de las mismas y del dictamen.(7)

---

(6) El tribunal de instancia, como parte de los documentos autenticados para evidencia en la conferencia con antelación a juicio, tuvo ante sí varios de sus estados financieros. Su examen no revela concluyentemente la situación de precariedad extrema en que apoya Ryder su tesis.

(7) De las doce (12) determinaciones de hecho esbozadas por el tribunal de instancia, creemos prudente comentar las siguientes:

La Núm. cuatro (4) expresa que Ryder "llegó a conocer íntimamente todos los pormenores del funcionamiento de Dolphin" por razón de la oficina que la primera tenía en las facilidades físicas de la segunda. Según antes señalado, el tipo de relación entre ambos —principal y agente— unido al hecho de que Ryder se dedica al mismo tipo de negocio en Estados Unidos, era más que suficiente para que ésta conociera el modo de operar de Dolphin. La mala fe de Ryder no surge en esta etapa.

En la determinación Núm. siete (7), el tribunal señala que las funciones desempeñadas por los empleados codemandados eran de tipo especializado y que no era común encontrar personas con esta preparación en el mercado de empleo en Puerto Rico. Ryder cuestiona la misma. Si bien es cierto que de los testimonios de Elba Meléndez y Alejo

Recapitulando, no existe error manifiesto, arbitrariedad, prejuicio o pasión en las conclusiones de hecho del tribunal sentenciador. No debemos intervenir. *Rivera Pérez v. Cruz Corchado,* 119 D.P.R. 46 (1987); *Valencia Ex parte,* 116 D.P.R. 909, 912 (1986); *Sánchez Rodríguez v. López Jiménez,* 116 D.P.R. 172, 181 (1985); *Pérez Cruz v. Hosp. La Concepción,* 115 D.P.R. 721, 728 (1984).[8]

Por los fundamentos expuestos, disentimos. "[E]n nuestra función de jueces hemos de rechazar las pretensiones de una parte que constituyan medio de eludir la aplicación de normas imperativas del ordenamiento." *Soriano Tavárez v. Rivera Anaya,* 108 D.P.R. 663, 671 (1979). En consecuencia, modificaríamos la sentencia del Tribunal Superior para eliminar la responsabilidad de los codemandados Joseph D'Bella, Elba Meléndez y Alejo Rivera. Así modificada, la confirmaríamos en sus restantes partes.

Sólo de este modo humanizamos verdaderamente las relaciones comerciales. Y es que "la Economía es actividad humana y como tal debe regularse por el derecho, inspirado en sus principios éticos generales válidos para toda la sociedad. La Honestidad, la Lealtad, la Veracidad, son tres principios de moral que se corresponden a tres reglas de Derecho: *No engañar, no perjudi-*

Rivera surge que el desempeño de sus funciones no requerían poseer una preparación académica especializada, es innegable que sus puestos requerían cierto grado de destreza y conocimiento que solamente es adquirida por la experiencia diaria. En efecto, toma cierto tiempo adaptarse a ese tipo de trabajo. El vacío creado simultáneamente con la partida de cuatro (4) empleados claves tuvo un efecto acumulativo perjudicial para Dolphin.

En su octava conclusión de hechos, el tribunal indica que "no existía en Dolphin persona que pudiera suplir las funciones que ejercían los empleados mencionados . . .". La misma es cualificable. La prueba realmente demostró que la empresa no podía funcionar con la ausencia *simultánea* de los cuatro (4) empleados en cuestión debido a que éstos constituían su "corazón". Claro está, la ausencia temporal de uno (1) o dos (2) de ellos no era motivo de alarma debido a que otros empleados podían sustituirlos.

En la conclusión Núm. once (11) el tribunal habla de la interferencia contractual torticera en que incurrió Ryder. Aunque por distintos fundamentos al pautado en *Gen. Office Prods. v. A.M. Capen's Sons,* supra, la interferencia ocurrió.

[8] Relativo a los proyectos de sentencia, consistentemente hemos indicado que su utilización, de por sí, no es una mala práctica. *Malavé v. Hosp. de la Concepción,* 100 D.P.R. 55 (1971). Lo censurable es "'[f]irmar a ciegas' dichos proyectos de sentencia". (Énfasis suprimido) *Román Cruz v. Díaz Rifas,* 113 D.P.R. 500, 508 (1982); *Báez García v. Cooper Labs., Inc.,* 120 D.P.R. 145 (1987).

*car, no dañar. A eso se llama Buena Fe y es la base de toda relación social, cualquiera sea su campo, incluso el económico.* No se trata nada más que de adecuar las relaciones humanas a los deberes de Honradez. O como diríamos al estilo de los antiguos juristas españoles: 'A verdad sabida y buena fe guardada'". (Énfasis suplido.) J.O. Von Oertel, *Algunas disgresiones sobre temas constitucionales, económicos y éticos,* 1977— Rev. Jur. Arg. La Ley 875, 882 (1977).