# 97 DTA 159

## TRIBUNAL DE CIRCUITO DE APELACIONES
## CIRCUITO REGIONAL DE CAGUAS, GUAYAMA Y HUMACAO

AGUSTIN NASSAR RIZEK
Demandante-Apelado

v.

HOSPITAL FONT MARTELO, INC.
DR. JULIO A. ORTIZ QUIÑONES
Demandados-Apelante

San Juan, Puerto Rico, a 30 de junio de 1997

Panel integrado por su Presidenta, Juez López Vilanova
y los Jueces Cabán Castro y Fiol Matta

Cabán Castro, Juez Ponente

## TEXTO COMPLETO DE LA SENTENCIA

Se nos solicita revoquemos una sentencia dictada por el Tribunal de Primera Instancia, Sala Superior de Humacao, el 31 de agosto de 1994 y archivada en autos, copia de la notificación a las partes el 6 de septiembre de 1994. Mediante dicha sentencia se condenó al Hospital Font Martelo, Inc. y al Dr. Armando Ortiz a pagar solidariamente a la parte aquí apelada la suma de $20,000.00 en resarcimiento por los daños causados al Dr. José Agustín Nassar por la revocación de sus privilegios médicos en el hospital Font Martelo; la suma de $45,000.00 por los ingresos dejados de percibir como consecuencia de la terminación de su contrato de servicio; y la suma de $150,000.00 por ingresos dejados de percibir por la terminación unilateral injustificada del contrato de sonografía, más intereses sobre esas sumas hasta el momento de su pago, costas y los gastos del litigio.

I

El 31 de diciembre de 1978, el Hospital Font Martelo, Inc. (en lo subsiguiente el *"Hospital"*) y el Dr. José Agustín Nassar Rizek (en lo subsiguiente *"Dr. Nassar"*) otorgaron un contrato de arrendamiento. Mediante dicho contrato acordaron que independientemente de la relación profesional existente entre ambas partes, el Dr. Nassar instalaría y operaría con exclusividad una máquina de ultrasonido diagnóstico de su propiedad para facilitar y mejorar la prestación de esos servicios a sus pacientes y los del Hospital. Esta máquina sería operada e instalada dentro de las facilidades del Hospital en un espacio que se arrendó al Dr. Nassar en el mismo contrato. ██ Se acordó también en éste que de no resultar exitosa o económicamente factible la operación de la máquina, el Dr. Nassar lo notificaría al Hospital y tendría la opción de dar por terminado el contrato de arrendamiento previo aviso de no menos de sesenta (60) días antes de la fecha de la terminación. ██

El Dr. Nassar invirtió $89,470.64 de su propio peculio para la adquisición e instalación de la máquina de ultrasonido diagnóstico.

Además del antes mencionado contrato, entre el Dr. Nassar y el Hospital existía un contrato de servicios, mediante el cual el Dr. Nassar le prestaba servicios profesionales a dicha institución en su

capacidad de radiólogo. Dicho contrato fue suscrito el 1ro. de octubre de 1980 y el mismo era por término indefinido pudiéndolo dar por terminado cualesquiera de las dos partes previo aviso escrito entregado personalmente noventa (90) días antes del vencimiento.

En septiembre del 1984, el Dr. Ahmed Bajandas y el Dr. Efraín Vázquez, le informaron al Dr. Nassar que se estaba poniendo en venta el Hospital Domínguez localizado, al igual que el Hospital Font Martelo, en Humacao. El Dr. Nassar le comunicó a los abogados del Hospital de la posibilidad de operar en ambas instituciones y desarrollarlas, pero no obtuvo respuesta alguna.

El Dr. Nassar y un grupo de médicos adquirieron el Hospital Domínguez.

Desde el 30 de enero de 1985 las relaciones del Hospital y el Dr. Nassar empezaron a sufrir cambios.

A principios de ese año, el Hospital comenzó conversaciones con el Dr. José Luis Valderrábano Marina, ofreciéndole trabajo como radiólogo.

Hasta mediados del 1985, el Dr. Nassar era miembro de la facultad médica del Hospital, desempeñándose como Director del Departamento de Radiología, puesto por el que no devengaba sueldo alguno.

El 26 de marzo de 1985, mediante carta del Hospital Font Martelo firmada por el Sr. Pedro Rivera Lugo, administrador del Hospital, el Dr. Nassar fue relevado de su cargo como Director del Departamento de Radiología pasando a ejercer dichas funciones el Dr. Valderrábano, efectivo inmediatamente y se dio por terminado su contrato de servicio como radiólogo a partir del 24 de abril de 1985.

Una vez relevado de su función de Director del Departamento de Radiología, al Dr. Nassar se le dieron por terminados sus servicios como radiólogo del Hospital y se le excluyó de reuniones, comités y actividades.

El 28 de marzo de 1985, el Dr. Nassar envía una comunicación al Hospital donde reclama el pago de los honorarios a él adeudados hasta ese momento más los que se podrían devengar hasta el vencimiento de su contrato, que son noventa (90) días a partir de la notificación del Hospital.

Aunque el contrato de servicios del Dr. Nassar se dio por terminado, el contrato de arrendamiento que este tenía con dicho Hospital permaneció vigente.

Para los años 1985 y 1986 se efectuaban un promedio de ciento cincuenta (150) estudios sonográficos mensuales, los cuales en el 1988 ascendieron a doscientos (200). El valor estimado de cada estudio era $50.00, por lo que se producía un ingreso bruto apróximado de $10,000.00 mensuales.

En el 1986, el Hospital adquirió otra máquina de ultrasonido diagnóstico, la cual instaló en sus facilidades, le dio publicidad entre posibles pacientes y la comunidad médica de Humacao, dando a entender que las mismas no existían en sus facilidades. La apertura de estas facilidades se llevó a cabo el 1ro. de junio de 1986.

El 27 de mayo de 1986 el Dr. Nassar radicó una demanda, ante el Tribunal de Primera Instancia, Sala Superior de Humacao, en la cual alegaba tres *"causas de acción"* contra el Hospital. [3] La primera causa de acción era sobre el incumplimiento contractual por parte del Hospital como consecuencia de la terminación unilateral y sin justa causa del contrato de exclusividad existente entre ambas partes. La segunda causa de acción era sobre la deuda del Hospital al Dr. Nassar por motivo del período de noventa días comprendidos entre el 27 de marzo de 1985 y el 24 de junio de 1985. Y la tercera causa de acción es sobre la terminación o revocación de los privilegios médicos del Dr. Nassar en el Hospital.

Luego de un extenso descubrimiento de prueba, varios trámites procesales y celebrada la vista en

su fondo, el 31 de agosto de 1994 instancia dictó la sentencia apelada. Oportunamente los apelantes solicitaron determinaciones de hechos y conclusiones de derecho adicionales las cuales fueron declaradas no ha lugar el 12 de abril de 1995, archivada en autos copia de la notificación a las partes de esta resolución el 18 de abril de 1995.

La parte apelante levanta en apelación la supuesta comisión de catorce errores. Para mayor claridad y concisión, los hemos agrupado de acuerdo a la relación que guardan entre sí, la cual no necesariamente corresponde al número con que fueron señalados en el escrito de apelación.

En síntesis, los señalamientos 1, 2, y 3 aducen que instancia erró al conceder daños sin prueba de los mismos; al admitir prueba especulativa y al condenar a los demandados al pago de $45,000 por estudios no practicados por el demandante. No tiene razón.

Hemos examinado el voluminoso expediente y leído cuidadosamente la transcripción de evidencia testifical del juicio y la misma nos convence de que hay prueba suficiente sobre daños y que la misma no es especulativa.

Los autos y la transcripción de evidencia revelan que, a pesar de existir un contrato entre el Dr. Nassar y el Hospital Font Martelo que exigía notificar la terminación del contrato con noventa (90) días de antelación, ya en enero de 1985 el Hospital estaba haciendo gestiones para conseguir un nuevo radiólogo. A fines de enero del 1985, le ofreció el puesto de Jefe de Radiología al Dr. Dávila, asistente del demandante en esos menesteres. El Dr. José L. Valderrábano, finalmente contratado como Jefe de Radiología en sustitución del Dr. Nassar, atestó que del Hospital Font Martelo le hablaron sobre ese trabajo en enero de 1985. (T.E. págs. 7-9) Para estas fechas no se le había notificado al Dr. Nassar la intención de dar por terminado el contrato.

El dueño del Hospital, al conocer la participación del demandante en la compra del Hospital Domínguez, lo tildó de *"competidor desleal"*, pero no utilizó los mecanismos legales que le proveen los reglamentos internos del hospital, si es que dicha actuación constituia una violación reglamentaria. Muy al contrario, el dueño del Hospital, el Dr. Ortiz, disolvió el Comité Ejecutivo de la Facultad Médica, foro en que se podían dilucidar estos asuntos y comenzó un patrón de hostilidad y marginación contra el Dr. Nassar.

El 26 de marzo de 1985, le notificó por carta la terminación del contrato mediante el cual el Dr. Nassar servía como Jefe de Radiología. Puesto que el contrato exigía notificación noventa (90) días antes de su terminación, el Dr. Nassar debió seguir como Jefe de Radiología hasta el 27 de junio de 1985. ■ Sin embargo, el 1ro. de abril de 1985, el Dr. Nassar fue desplazado como Jefe de Radiología por el Dr. Valderrábano, a quien el Hospital contrató para ese puesto. Más aún, el nombramiento del Dr. Valderrábano no sólo despojó al demandante de su puesto de jefe por los últimos noventa (90) días del contrato, sino que lo privó de hacer su trabajo como radiólogo, por el cual recibía emolumentos. Testificó el Dr. Valderrábano que cuando el demandante se presentó en abril a la oficina de radiología *"fue allí como si él fuera a dar los servicios también allí y yo le dije, pero bueno, yo no necesito a más nadie, porque yo sé que con una persona se hace el trabajo que hay allí y que yo entendía que yo tenía el contrato, un contrato con el Hospital [Font Martelo], y que no sabía de alguien más trabajando allí"*. (T.E. p. 46) El Dr. Valderrábano sólo le ofreció, a requerimiento del demandante, de si podía ayudarlo en algo, que se ocupara de la facturación, cosa que el demandante no aceptó. Las elocuentes expresiones del Dr. Valderrábano son demostrativas de que el demandante fue privado de facto de su trabajo como radiólogo. La prueba es clara y reiterada en cuanto a que desde principios de abril de 1985 el Hospital no refirió un sólo estudio radiológico más al Dr. Nassar.

Por otra parte, y a pesar de que el demandante seguía operando en las facilidades de la demandada, un servicio de sonografía con carácter de exclusividad, el Hospital instaló una máquina para ofrecer ese servicio y lo publicó entre la comunidad médica y los pacientes, anunciando que dichos servicios serían ofrecidos por el Dr. Valderrábano, no por el Dr. Nassar. No hay controversia acerca de que el Hospital actuó como se ha dicho. Lo que intenta controvertir la apelante es si en efecto el contrato para prestar servicio de sonografía tenía o no carácter de exclusividad. Ya hemos dejado entrever al principio de este párrafo que el contrato sí garantizaba la exclusividad, pero abundaremos en ello a propósito de los siguientes señalamientos de error.

En sus señalamientos 5to., 6to. y 7mo. alega la parte apelante que constituyó error interpretar el contrato de arrendamiento del local como que otorgaba al demandante ejercer con exclusividad la práctica de la sonografía en las facilidades del Hospital Font Martelo; concluir que el hospital tenía la obligación de referir todos los pacientes que requiriesen una sonografía al Dr. Nassar; y que, en el supuesto de que el contrato fuese con exclusividad, el Dr. Nassar incumplió su obligación al prestar servicios de sonografía a los pacientes del Hospital Font Martelo. No tiene razón.

La parte apelante gasta tinta temerariamente en argumentar que el contrato de arrendamiento de un local en el Hospital Font Martelo no tenía carácter de exclusividad a favor del Dr. Nassar para la práctica de la sonografía en ese hospital. Recurriendo a sofismas, pretende que las únicas obligaciones de un contrato son las que aparecen escritas bajo el apartado de *"cláusulas y condiciones"* y que la *"exclusividad"* de que se habla en la parte expositiva del contrato se refiere a exclusividad del arrendamiento, no de la práctica de la sonografía.

En primer lugar, no sólo lo expresamente pactado como las cláusulas y condiciones obligan a las partes ligadas por un contrato. Hay otras cosas que rodean el contrato que son obligatorias para las partes. Así, la buena fe y la intención de las partes cuando las palabras parecen contrarias a éstas, prevalecerán aquéllas sobre éstas. (Código Civil, Art. 1233, 31 L.P.R.A. §3471). En cuanto al texto, la apelante pretende fraccionarlo y confinar las obligaciones a lo expresado en las cláusulas. Rechazamos ese enfoque. Los contratos deben ser analizados e interpretados como un todo integral del cual, en caso de oscuridad en sus cláusulas, pueda extraerse la intención de las partes. Por eso se ha resuelto que *"al igual que en el caso de un estatuto, los varios términos de un contrato deben leerse conjuntamente y armonizarse con el fin de determinar la verdadera intención de las partes". Ulpiano Casual, Inc. v. Totty Mfg. Corp.,* 90 D.P.R. 739 (1964).

La parte expositiva del contrato en cuestión indica que *"el arrendatario [Dr. Nassar] ha pactado con la arrendadora [Hospital Font Martelo] instalar con exclusividad y operar con exclusividad maquinaria de Ultrasonido Diagnóstico... Que la intención era conceder la exclusividad de ese servicio al demandante surge claramente de la letra del contrato. Pero si ello no fuera suficiente, el testimonio de la persona que negoció ese arreglo y que redactó el contrato disipa cualquier duda no justificada. En efecto, el testimonio del Sr. Rogelio Díaz Reyes, quien servía como Administrador del Hospital Font Martelo para la fecha en que se otorgó el contrato, explicó todo el proceso seguido para llegar al acuerdo entre las partes. El Dr. Nassar expuso la necesidad y conveniencia de instalar una máquina de sonografía, pero como resultaba muy cara el hospital no podía adquirirla. Así que se le propuso al Dr. Nassar que la comprara él y nosotros le garantizábamos que todos nuestros pacientes los referiríamos a él".* (T.E. p. 63; véanse, además, págs. 64-65 y 74).

La prueba respalda la conclusión de instancia acerca de la exclusividad del contrato y de la obligación de la apelante de referir **todos** sus pacientes de sonografía al Dr. Nassar.

La apelante sostiene, en la alternativa de que el contrato fuera de exclusividad, que el Dr. Nassar incumplió sus obligaciones de prestarle los servicios de sonografía a los pacientes del Hospital Font Martelo. La prueba demuestra que el Dr. Nassar continuó ofreciendo el servicio de sonografía a los pacientes del Hospital Font Martelo entre abril de 1985 y junio de 1986, cuando el hospital contrató con el Dr. Valderrábano para que éste instalara y operara otra máquina de ultrasonido en las facilidades del hospital. Así surge de la transcripción de la evidencia testifical.

*"P. (Licenciado Israel Delgado Ramos, en representación de la demandada-apelante): "Los servicios de pacientes que estaban hospitalizados, durante el tiempo, antes del tiempo de usted comprar su máquina en 1986, usted empezó en abril del '85, tenemos trece meses; esos servicios a los pacientes hospitalizados de sonografía, ¿quién los prestaba y cómo?*

*R. (Dr. Valderrábano): Bueno, el doctor Nassar". (T.E. pág. 41)"*

Y más adelante aparece el siguiente intercambio entre los ya dichos cuando la representación de la demandada intentaba establecer las razones que tuvo el Hospital para solicitar al Dr. Valderrábano que ofreciera servicio de sonografía.

"P. ¿Le decían ellos a usted las razones por las cuales le solicitaban eso?

R. Sí. Como que hacía falta.

P. Hacía falta, ¿por qué?

R. O sea, como, lo que tenía entendido era que el Dr. Nassar prácticamente lo que daba de servicio eran **los pacientes hospitalizados allí solamente**. Y entonces pues, ellos querían tener todos los servicios de sonografía en el hospital disponible".

El testimonio del propio médico que desplazó al demandante como Jefe de Radiología del hospital demandado estableció claramente que el Dr. Nassar no incumplió sus obligaciones hacia los pacientes del Hospital.

Los señalamientos 8vo. y 9no. le imputan al tribunal haber errado al no determinar que las actuaciones del demandante constituyeron una violación a la buena fe contractual; y por no declarar resuelto la relación contractual por incumplimiento de las obligaciones del demandante.

Ya establecimos que el demandante no incumplió sus obligaciones, sino que continuó ofreciendo servicios de sonografía a los pacientes del Hospital Font Martelo hasta que éste comenzó a utilizar solamente los servicios de sonografía del Dr. Valderrábano en junio de 1986. No había razón en derecho para resolver el contrato a base del Artículo 1077 del Código Civil, 3 L.P.R.A. § 3052.

En cuanto a la violación a la buena fe contractual, la prueba revela que las actuaciones del demandante que sirven de base a esta alegación de la apelante son una práctica común y generalizada que no puede constituir una violación a la buena fe. Así lo demuestra el siguiente intercambio entre la representación de la apelante (Lcdo. Delgado) y el testigo pericial Rogelio Díaz Reyes, ex-administrador del Hospital de 1977-1984.

"P. Nos dice usted que la relación que existía entre el Hospital Font Martelo y el doctor Nassar, quien era, prestaba los servicios "full time"; era una relación de confianza.

R. Y profesional.

P. Y profesional. La prestación de servicios a otro hospital en la misma capacidad sin el consentimiento del Hospital Font Martelo, viola esa relación de confianza.

R. No.

P. ¿Porqué no?

R. Porque es una práctica en todos los hospitales. Por ejemplo, el patólogo nuestro tiene contrato con [el Hospital] Ryder y [con el Hospital] Domínguez, el que teníamos nosotros. Y así distintas personas tienen contrato con otras personas porque no podemos limitarle. Uno de los principios básicos en esta, en el área de los médicos, no podemos limitarlo.

P. La pregunta mía es, sin el consentimiento del hospital que me refiero a la, no meramente a la Facultad Médica...

Lcdo. Gallart: Hay objeción.

Lcdo. Delgado:... del hospital, sino a su Junta de Accionistas, no por el contrato."

(Hay intercambio sobre la objeción y finalmente el juez resuelve).

"Hon. Juez: Vamos a dejar que el testigo conteste, al Tribunal le interesa esa respuesta.

Testigo: O sea, es la, es la práctica en la industria. En cualquier sitio que usted va los médicos

*tienen privilegios y en ningún hospital puede negarle privilegios a un médico porque tenga en otro lado. Ni la Junta de Directores puede hacer a menos que sea otro tipo de contrato ya, de otra índole, pero en privilegios de servicios profesionales tenemos que seguir lo que está establecido o el "new processing" no es los servicios que nos garanticen el cuidado mejor al paciente" [sic].*

*Lcdo. Delgado: Usted está hablando de privilegios que es una cosa distinta, entiendo yo, a cuando hay un contrato respecto a la prestación de unos servicios.*

*R. Hay un problema, si me permite, licenciado.*

*P. Sí.*

*R. Para yo hacer un contrato con un médico en un hospital tiene que tener privilegio.*

*P. Dígame.*

*R. Tiene que pasar por ese proceso, una vez pasa por ese proceso ya es miembro de la Facultad, pues entonces nosotros podemos hacer contrato con esa persona porque esa persona es ya miembro de la Facultad del hospital."* (T.E. págs. 80-82).

Obviamente, tener privilegios y, como parte de éstos, tener contratos con más de un hospital es una práctica general en la empresa hospitalaria. Siendo una práctica general, tenía que ser conocida y/o prevista por la gerencia del Hospital, por lo que mal puede ésta quejarse de una violación a la buena fe si uno de sus médicos obtiene privilegios y/o contratos con otro hospital.

En los señalamientos 10mo. y 12mo. se aduce que erró instancia al determinar que la apelante privó al demandado de sus privilegios y que el Dr. Ortiz, dueño del Hospital, fue un tercero que interfirió torticeramente en las relaciones contractuales entre el Dr. Nassar y el Hospital Font Martelo.

El testimonio del Dr. Valderrábano estableció que una vez éste comenzó a trabajar en radiología en el Hospital Font Martelo, como no había trabajo para más de una persona y él era el que tenía el nuevo contrato, no se refirió ningún otro trabajo de radiología al demandante. Tanto la prueba documental como testifical reveló que el Comité Ejecutivo de la Facultad Médica fue disuelto por el co-demandado, Dr. Ortiz. Al disolver este cuerpo rector, con facultad para entender en controversias sobre violaciones a normas y procedimientos internos, el demandante quedó despojado del foro donde podía plantear y defender sus derechos. Desde el momento en que dejó de referírsele casos de radiología y se disolvió el Comité Ejecutivo el status de *"privilegio"* de que gozaba el demandante se tornó en un estado hueco, vacío, sin contenido ni sustancia. Porque ¿en qué puede consistir un *"privilegio"* médico si no hay pacientes que atender y no hay organismos en los cuales participar? No cabe duda que las acciones de la apelante privaron de sus privilegios al demandante.

En cuanto a la responsabilidad personal del co-demandado Dr. Ortiz, la apelante alega que no procede porque éste actuó en su calidad de oficial de la corporación que preside, el Hospital Font Martelo, Inc., de la cual es accionista mayoritario. No tiene razón.

De ordinario, los oficiales de una corporación no tienen facultad para obligar a ésta por el sólo hecho de que ocupan un cargo de oficial. Para determinar si la actuación de un oficial es obligatoria para la corporación hay que examinar si la actuación se realiza bajo autoridad expresa, bajo autoridad implícita o bajo autoridad aparente. Bajo la primera, la actuación es válida si la autoridad emana de una resolución de la Junta de Directores o de los estatutos. En el segundo caso se trata de una autoridad inherente al cargo, como comprar materiales y equipo, contratar empleados, etc. Bajo la autoridad aparente, los actos de un oficial obligan a la corporación si ésta aparenta o transmite la idea, a personas razonables, de que el oficial tenía autoridad para hacer lo que estaba haciendo. Negrón Portillo, Derecho Corporativo Puertorriqueño, 1995, págs. 158-159.

Resulta obvio que nadie puede tener autoridad expresa, ni implícita, ni aparente para entorpecer o violentar relaciones contractuales válidas y vigentes entre dos personas. Pero es que aun si aceptáramos que el Dr. Ortiz actuó en su calidad de oficial corporativo tendríamos que concluir que su

actuación es *"ultra vires"* porque no puede estar dentro de los poderes y facultades de una corporación o sus oficiales el entorpecer las obligaciones pactadas con otro contratante.

El testimonio del Dr. Valderrábano ofrece base suficiente para sostener que la instalación y operación de un nuevo servicio de sonografía, estando vigente el contrato exclusivo con el Dr. Nassar, fue una instigación del Dr. Ortiz. El Dr. Valderrábano declaró que desde el principio le pidieron que pusiera servicio de sonografía. Como pasaba el tiempo y el nuevo servicio no era instalado, lo llamaron de administración y le dijeron que estaban en tratos con otro médico para que diera ese servicio, que si él (Valderrábano) no lo proveía lo iba a poner otro. Esto precipitó la decisión de Valderrábano de iniciar el nuevo servicio, a pesar de estar vigente el contrato exclusivo con el Dr. Nassar y de continuar éste prestando el servicio.

Sobre este aspecto, los hechos que encontró probados el tribunal de instancia, y que hallan amplio eco en la prueba, sostienen la presencia de los elementos que requiere la figura de contrato en daño de tercero, a saber: 1) un contrato con el cual interfiera un tercero; 2) que haya mediado culpa (actuación intencional); 3) que se ocasione daño al que ejercita la acción y 4) que haya un nexo causal entre la acción culposa y el daño. *Gen. Office Prods. v. A.M. Capenis Sons,* 115 D.P.R. 553 (1984), seguidos en *Dennis v. City Fed. Sav.,* 121 D.P.R. 197 (1988) y *Dolphin International of P.R. Inc. v. Ryder Truck Lines Inc.,* 127 D.P.R. 869 (1991).

El señalamiento 11mo. resulta inmeritorio. Sostiene el apelante que constituyó un error de instancia conceder la suma de $20,000.00 como daños morales por incumplimiento contractual. Si ello fuera cierto, sin duda el tribunal habría cometido un error, pues los daños y angustias no son recobrables en acciones por incumplimiento contractual. Pero no dice tal cosa la sentencia apelada.

La suma de $20,000.00 impuesta a la apelante no lo fue en concepto de daños morales. Claramente sostiene la sentencia que dicha suma se concede *"en resarcimiento de todos los daños sufridos por el demandante como **consecuencia de la revocación antireglamentaria y en violación a un debido proceso de ley de sus privilegios médicos"*. (Enfasis suplido) En primer lugar la sentencia no particulariza los daños, sino que se concede por *"todos los daños sufridos"*. De modo que carece de base afirmar que dicha suma se concede por daños morales. Es cierto que en las Conclusiones de Derecho se afirma que *"por la naturaleza del contrato entre las partes, resultaban previsibles a los demandados no sólo los daños patrimoniales, sino también los morales y espirituales que su [sic] inobservancia de dicho Reglamento habrían de causar, por lo que responden por ellos al demandante"*. Sentencia pág. 19. Sacada de contexto, la expresión parece errónea, pero no lo es. Antes de esta expresión, la sentencia elabora muy bien cómo el Hospital Font Martelo, en armonía con lo dispuesto en la Ley Núm. 101 de junio de 1965, según enmendada, 24 L.P.R.A. § 331 *et. seq.,* ▉ y del *"Reglamento para Facilidades de Salud de Puerto Rico",* ▉ adoptó su propio Reglamento, en el que estableció procedimientos para denegar privilegios profesionales y de apelación ante situaciones o decisiones adversas tomadas por la facultad contra uno de sus miembros. El tribunal determinó que las actuaciones del co-demandado Ortiz, contrarias al Reglamento, privaron al demandante de sus privilegios médicos y de un foro donde reclamarlos. Ese daño no es de naturaleza contractual, sino que es producto de la violación a los derechos reconocidos por reglamento al demandante. En tal caso, son recobrables los daños y angustias mentales y/o morales. Puesto que el demandante se vio privado de ejercer sus privilegios y de obtener ingresos, no hay duda de que la partida de $20,000.00 incluye, además, los daños patrimoniales. Ciertamente, se trata de una suma conservadora. La fijación de daños en este tipo de caso supone siempre un juicio estimativo que no requiere precisión ni certeza matemática.

El cuarto señalamiento aduce que la sentencia no representa el balance más racional, jurídico y justiciero de la totalidad de la prueba presentada. No estamos de acuerdo. Creemos que es todo lo contrario.

El extenso y a veces repetitivo expediente no impidió que revisáramos detalladamente su caudal de documentos, relacionando y contrastando unos con otros, hasta obtener una visión global de los elementos que conformaron esta controversia y de las circunstancias que la rodearon antes y durante el largo proceso judicial. Lo que hemos extraído de este minucioso estudio es un cuadro de actuaciones ilegales, arbitrarias y caprichosas para privar al demandante de sus privilegios como

miembro de la Facultad Médica del Hospital Font Martelo y una actuación intencionalmente dañosa de las obligaciones contractuales contraídas con el demandante. La apelante nos recuerda que *"las conclusiones de hechos de un tribunal de anterior instancia se consideran claramente erróneas si del examen de la totalidad de la evidencia el tribunal de revisión queda definitiva y firmemente convencido que un error se ha cometido, como en el caso en que las conclusiones de hechos están en conflicto con el balance más justiciero y jurídico de la totalidad de la evidencia recibida". Maryland Casualty v. Quick Const. Corp.,* 90 D.P.R. 328 (1964). El problema es que este Tribunal está definitiva y firmemente convencido de que no se cometió error y que las conclusiones de hechos no están en conflicto con la prueba.

Réstanos analizar los señalamientos 13ro. y 14to. relativos a la imposición del pago de intereses sobre las cuantías impuestas a los demandados y el pago de intereses bajo la R. 44.3 (b) de Procedimiento Civil a pesar de no haber hecho una determinación sobre temeridad.

El error 13ro. es totalmente inmeritorio. La apelante se apoya en el Artículo del Código Civil [7] para sostener que las cantidades impuestas por la sentencia no habían sido determinadas al momento de dictarse la misma y, por lo tanto, eran inciertas, lo que quiere decir que no eran exigibles cuando se radicó la demanda.

Es un principio elemental de derecho que una ley especial prevalece sobre una ley general de la misma materia. El Código Civil, en lo atinente, es ley general, prevaleciendo en este asunto lo dispuesto en las Reglas de Procedimiento Civil, 32 L.P.R.A. Ap. II, R. 44.3 (a). La citada regla dispone:

*"Se incluirán intereses al tipo legal en toda sentencia que ordene el pago de dinero a computarse sobre la cuantía de la sentencia, desde la fecha en que se dictó la sentencia y hasta que ésta sea satisfecha, sin incluir costas y honorarios de abogados."*

Es por ministerio de esta Regla, no del Código Civil, que procede la imposición del pago de intereses en una sentencia que ordene el pago de alguna suma de dinero.

El 14to. y último señalamiento sostiene que se impuso el pago de intereses bajo la Regla 44.3 (b) de las de Procedimiento Civil sin haberse hecho una determinación de temeridad ni de imposición de honorarios de abogado. El tribunal de instancia impuso el pago de intereses 1) desde la radicación de la demanda por daños como consecuencia de la revocación antireglamentaria de los privilegios del demandante; 2) desde que debieron abonarse las cantidades dejadas de devengar por el incumplimiento de la apelante de la cláusula de noventa (90) días para la terminación del contrato como Jefe de Radiología; y 3) desde la presentación de la demanda por los daños sufridos por la terminación unilateral, sin justa causa, del contrato sobre servicios de sonografía. Tiene razón la apelante. Dispone la citada regla:

*"El tribunal impondrá a la parte que haya procedido con temeridad el pago de interés legal desde que haya surgido la causa de acción en todo caso de cobro de dinero y desde la radicación de la demanda, en casos de daños y perjuicios."*

*La regla dispone la imposición de intereses a la parte que haya procedido con temeridad. La temeridad es una cuestión de hecho que debe ser decidida por el tribunal para que, como cuestión de derecho, puedan imponerse los intereses bajo esta Regla. Aunque se ha resuelto que la determinación de hecho acerca de existencia de temeridad es discrecional del tribunal de instancia, [8] esa discreción no llega tan lejos como para imponer los intereses punitivos autorizados por esta regla sin una previa determinación sobre la existencia de temeridad.*

*Instancia no hizo una determinación de temeridad y, por tanto, los intereses sólo deben imponerse, de conformidad con la Regla 44.3 (a), desde la fecha en que se dictó la sentencia".*

Por los fundamentos antes expuestos resolvemos modificar la sentencia apelada a los únicos fines de imponer el pago de intereses desde la fecha en que se dictó la sentencia. Así modificada se confirma dicha sentencia.

Así lo acordó y manda el Tribunal y lo certifica la Secretaria General.

Aida Ileana Oquendo Graulau
Secretaria General

### ESCOLIOS 97 DTA 159

**1.** Este contrato era por el término de diez (10) años, prorrogable por dos términos adicionales consecutivos de cinco años cada uno en forma opcional para el Dr. Nassar, notificándole por escrito al Hospital treinta (30) días antes del vencimiento del término y obligatorio para el Hospital previo acuerdo del ajuste del canon de arrendamiento.

**2.** Dicho contrato tiene un *"addendum"* suscrito el 1ro. de noviembre de 1982, donde se enmiendan las cláusulas sobre la cabida del local arrendado, el canon de arrendamiento y se especifica que el pago por el servicio de electricidad sería por cuenta del Dr. Nassar.

**3.** Dicha demanda fue enmendada el 13 de junio de 1988 incluyéndose en la misma al Dr. Armando Ortiz, accionista mayoritario del Hospital y al Dr. Valderrábano.

**4.** El contrato establecía que: *"Cualesquiera de las partes aquí comparecientes podrá dejar sin efecto este contrato previo aviso escrito y entregado personal a la otra parte con noventa (90) días de anticipación a la efectividad de dicha acción, sin derecho a ningún tipo de reclamación adicional entre ellas. **No obstante, ambas partes cumplirán estrictamente con lo aquí pactado hasta el vencimiento del término de noventa (90) días, y las cláusulas pactadas continuarán así en pleno vigor"***.

**5.** Conocida como Ley de Facilidades de Salud.

**6.** Aprobado al amparo y de conformidad con la entonces vigente Ley Núm. 112 de junio de 1957, 3 L.P.R.A. § 1041 *et. seq.*, conocida como Ley de Reglamentos de Puerto Rico.

**7.** *"Será exigible, desde luego, toda obligación cuyo cumplimiento no dependa de un suceso futuro o incierto, o de un suceso pasado que los interesados ignoran.*

*También será exigible toda obligación que contenga condición resolutoria, sin perjuicio de los efectos de la resolución. 31 L.P.R.A. § 3041."*

**8.** *Sainz González v. Banco de Santander de Puerto Rico.*