ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| NAZARENO ENTERPRISES AND SERVICES, INC.<br><br>Apelado<br><br>v.<br><br>PUERTO RICO PROSTHETICS MANUFACTURING, CORP.; JOSÉ HERNÁNDEZ RODRÍGUEZ; MARILUZ CRUZ TORRES; ROCÍO PONTÓN FERNÁNDEZ; SAMUEL PÉREZ FIGUEROA; VIVIANA A. RODRÍGUEZ RIVERA<br><br>Apelantes | KLAN202300664 | *Apelación* procedente del Tribunal de Primera Instancia, Sala Superior de Bayamón<br><br>Caso Núm.:<br>D PE2009-1350<br><br>Sobre:  Interdicto Permanente, Interdicto Preliminar; Violación de Contrato, Daños y Perjuicios |

Panel integrado por su presidente, el Juez Rivera Colón, el Juez Ronda Del Toro y la Jueza Díaz Rivera

**Ronda Del Toro, Juez Ponente**

## SENTENCIA

En San Juan, Puerto Rico, a 7 de marzo de 2024.

Comparece ante nos el Sr. José Hernández Rodríguez (en adelante señor Hernández Rodríguez o apelante), quien solicita que revisemos la *Sentencia* que emitió el Tribunal de Primera Instancia, Sala de Bayamón, en adelante TPI.  Mediante esta, el foro primario les impuso responsabilidad a los demandados por violentar una cláusula de no-competencia.

Por los fundamentos que expondremos a continuación, **modificamos** la *Sentencia* apelada y así modificada, confirmamos.

## I.

El 18 de noviembre de 2009, Nazareno Enterprises and Services Inc. (Nazareno o parte apelada), una corporación que se

dedicaba a la venta de equipos ortopédicos, presentó una *Demanda* por incumplimiento de contrato contra Puerto Rico Prosthetics Manufacturing, Inc. (en adelante PR Prosthetics), Marilú Cruz Torres, Rocío Pontón Fernández, Samuel Pérez Figueroa (Sr. Pérez Figueroa) y Vivian A. Rodríguez Rivera (en conjunto, exempleados o apelantes). En síntesis, alegó que suscribió un Contrato de Empleo con los exempleados que contenía una cláusula de no competencia que lee de la siguiente forma:

> El compareciente de la **SEGUNDA PARTE** se compromete a formalizar mediante la firma del presente contrato una obligación de No Competencia (no competition) con la empresa que lo contrata. **Esta cláusula abarca el concepto de "no competencia" durante la vigencia del contrato o un (1) año** luego de finalizada la relación profesional entre las partes. La **SEGUNDA PARTE** se abstendrá de participar, asesorar, intervenir y otros directa o indirectamente con negocios, entidades o personas que sean o puedan ser competencia al negocio que realiza la compareciente de la PRIMERA PARTE.[1]

Adujo que los codemandados comenzaron a prestar servicios para PR Prostetics, alrededor del 1 de octubre de 2009 y que estos visitaron los mismos clientes de la parte demandante, cubriendo la misma ruta que le asignó Nazareno. Alegó que PR Prostetics, al contratar a los exempleados, interfirió con los contratos de empleo y en consecuencia responde por daños. A base de esto, solicitó daños contractuales y la expedición de un *injunction* preliminar y permanente contra sus exempleados. Reclamó la suma de $768,000.00 por daños contractuales, más costas, honorarios e intereses legales.

El 9 de julio de 2010 el foro primario dictó una *Sentencia* mediante la cual declaró *No Ha Lugar* la solicitud interdictal. En

---

[1] Apéndice págs. 578-591. Énfasis suplido en el original.

síntesis, concluyó que la acción se apoyó en una "cláusula de no competencia que adolece de nulidad."[2] Esta sentencia fue revocada el 3 de noviembre de 2010 por el Tribunal de Apelaciones en la causa KLAN201001337[3]. Allí el foro determinó que el contrato no era nulo y devolvió el caso al TPI para que determine si hubo violación de contrato por infracción de la cláusula de no competencia y de resolver si Nazareno sufrió daños, el monto y quiénes deben responderle.

Posteriormente, el 10 de enero de 2012, Nazareno enmendó la reclamación para incluir en el pleito al Sr. José Hernández Rodríguez (en adelante señor Hernández Rodríguez), presidente de PR Prosthetics, su esposa Melissa Maldonado Rivera (en adelante señora Maldonado Rivera) y la sociedad legal de bienes gananciales compuesta por ambos.[4] El 2 de mayo de 2012, el señor Hernández Rodríguez contestó la demanda enmendada. Por su parte, la señora Maldonado Rivera contestó la demanda enmendada el 6 de julio de 2012.

Luego de varios trámites, el 17 de junio de 2014 el foro primario dictó una sentencia mediante la cual decretó que los demandados infringieron los contratos de no competencia que suscribieron los exempleados del demandante. El 21 de enero de 2015 un panel del Tribunal de Apelaciones evaluó la corrección de la referida sentencia, en la causa KLAN201401440. Después del análisis de rigor, decretó modificar la *Sentencia Sumaria Parcial* a los únicos efectos de eliminar la atribución de responsabilidad solidaria determinada contra la señora Maldonado Rivera y la Sociedad Legal de Gananciales compuesta por esta y su esposo,

---

[2] Apéndice págs. 419-430.
[3] Tomamos conocimiento judicial de la causa KLAN201001337.
[4] Apéndice pág. 407-411.

el señor Hernández Rodríguez. El foro intermedio confirmó la sentencia en los demás extremos. Quedando el caso pendiente para recibir prueba sobre los daños ocasionados.

Tras varios trámites, el 15 de febrero de 2019 las partes suscribieron un Informe Enmendado de Conferencia con Antelación al Juicio. Como parte de la prueba documental, Nazareno Enterprises incluyó un informe pericial del Dr. Jaime Del Valle con sus documentos de apoyo. Además, identificó como testigo y perito al Dr. Jaime Del Valle por ser un economista y por haber preparado un informe de los daños causados a Nazareno Enterprises por razón de las acciones torticeras que conllevaron la violación a los contratos de no competencia. Los demandados no identificaron perito alguno. [5]

Así las cosas, los días 4, 5 y 6 de junio de 2019 se celebró la audiencia. El Tribunal admitió en evidencia el Informe Pericial rendido por el Dr. Jaime Del Valle y su *curriculum vitae*. Por su parte, los demandados objetaron la admisibilidad de los anejos al informe pericial del Dr. Jaime Del Valle. El TPI se reservó el asunto de la admisibilidad de los anejos del Informe Pericial para abordarlo en su sentencia.[6]

El 12 de agosto de 2019 el codemandado, señor Hernández Rodríguez, suscribió un *Memorando de Derecho sobre valor probatorio de informe y testimonio pericial*. En síntesis, alegó que el tribunal debió denegar la admisibilidad de los anejos al informe pericial del Dr. Del Valle, por ser inadmisibles para probar la veracidad de su contenido como prueba sustantiva de los ingresos y las alegadas pérdidas experimentadas por Nazareno. Alegó que

---

[5] Apéndice pág. 341-377, en especial las páginas 359-360.
[6] Véase, Transcripción Vista 6 de junio de 2019, págs. 109-110.

los documentos fueron objetados por no haber sido autenticados y porque su contenido constituía prueba de referencia inadmisible. Arguyó que el demandante no presentó, de manera independiente, prueba alguna sobre las pérdidas que Nazareno Enterprises alega haber experimentado a raíz de la conducta imputada de la parte demandada. Que, en tal caso, el perito no podía opinar sobre prueba inadmisible.

El 22 de agosto de 2019 Nazareno presentó una *Réplica a escritos sobre admisibilidad de documentos anejados a opinión pericial*. Alegaron que los documentos que se anejaron al informe del perito Dr. Jaime Del Valle fueron los siguientes: (a) Planillas de contribución para Negocios exentos Acogidos a la Ley 135 de 1997; (b) Planillas de contribución sobre ingresos para negocios exentos bajo programa de incentivos PR; (c) Estados financieros suscritos por el CPA Daniel Barreto, Lic. 193; (d) Tablas generadas por el Departamento de facturación de la parte aquí compareciente. En el referido escrito, el demandante arguyó que en la vista del 6 de junio de 2019 el tribunal expresó que no admitiría los Anejos al informe pericial, pero permitió a las partes expresarse sobre el asunto. [7] Adujo, en suma, que es improcedente en derecho la pretensión de los codemandados que se deje sin efecto su determinación admitiendo el informe pericial y testimonio del Dr. Del Valle. Reiteró que los anejos del informe pericial son admisibles por cumplir con las Reglas de Evidencia números 901, 902 (B) (C) y (K) o en la alternativa, constituyen documentos en que razonablemente descansaría un perito para emitir su opinión de conformidad a las Reglas de Evidencia números 704, 705.[8]

---

[7] Apéndice págs. 312-313.
[8] Apéndice pág. 42.

Las partes presentaron memorandos sobre los hechos probados en las vistas. Así las cosas, el 28 de octubre de 2020 el Tribunal de Primera Instancia emitió una Sentencia mediante la cual determinó que el señor Hernández Rodríguez y los exempleados violentaron la cláusula de no competencia. Por esta razón, los condenó al pago solidario de $673,003.00 por los daños ocasionados mientras que al señor Hernández Rodríguez se le impuso el pago de $49,500.00 por gastos incurridos en un seminario y $25,000.00 por concepto de honorarios de abogado.[9]

En desacuerdo, y luego de varios trámites procesales que giraron en torno a la notificación de la sentencia, el 31 de julio de 2023 el señor José Hernández Rodríguez presentó un recurso de apelación. En este plantea la comisión de los siguientes errores, a saber:

> Primero: Erró el Honorable Tribunal de Primera Instancia al dictar Sentencia y condenar al Sr. Hernández al pago de "$673,003.00" solamente a base de un informe y testimonio pericial que carecen enteramente de valor probatorio.
>
> Segundo: Erró el Honorable Tribunal de Primera Instancia al imponerle al codemandado, Sr. Hernández, el pago de la totalidad de un semanario ($49,000) ofrecido a toda la plantilla de empleados de Nazareno por tres meses y en el cual la participación de los codemandados exempleados se limitó a tan solo tres días.
>
> Tercero: En la alternativa, erró el Honorable Tribunal de Primera Instancia al resolver que el daño sufrido por Nazareno era a perpetuidad y no por el año que dura la cláusula de no competencia y sin ajustar los números base para considerar el tiempo que los codemandados exempleados trabajaron para Nazareno durante el 2009.

Con el beneficio de la Transcripción Estipulada, el escrito de Apelación y Alegato Suplementario de la parte apelante y el alegato en oposición de la parte apelada, evaluamos.

---
[9] Apéndice págs. 221-262.

**II.**

### A. Prueba pericial

La Regla 702 de Evidencia 32 LPRA Ap. VI, R. 702, regula el testimonio pericial. Reza la norma, en su parte pertinente:

> **Cuando conocimiento** científico, técnico o **especializado sea de ayuda para** la juzgadora o el juzgador poder entender la prueba o **determinar un hecho en controversia**, **una persona testigo capacitada como perita** —conforme a la Regla 703—**podrá testificar en forma de opiniones o de otra manera**. […] (Énfasis nuestro).

En nuestro ordenamiento jurídico rige una norma liberal en cuanto a la capacidad de un testigo para declarar, pero no necesariamente para cualificarse como perito. Para que pueda calificarse como un experto o perito, de conformidad con la Regla 703 de Evidencia 32 LPRA Ap. VI, R. 703,[10] la persona testigo debe tener especial conocimiento, destreza, experiencia, adiestramiento o instrucción suficiente en la materia sobre el cual testificará. De la aludida norma surge que, a través de su educación o experiencia, el perito ha desarrollado un conocimiento o destreza sobre una materia, por lo cual puede formar una opinión que sirva de ayuda al juzgador de hechos. McNeil Healthcare, LLC v. Municipio de Las Piedras, 206 DPR 659, 677 (2021). A esos efectos, **una persona puede cualificarse como**

---

[10] La Regla 703 de Evidencia, establece:

Calificación de la persona perita

(a) Toda persona está calificada para declarar como testigo pericial si posee especial conocimiento, destreza, experiencia, adiestramiento o instrucción suficiente para calificarla como experta o perita en el asunto sobre el cual habrá de prestar testimonio. Si hubiere objeción de parte, dicho especial conocimiento, destreza, adiestramiento o instrucción deberá ser probado antes de que la persona testigo pueda declarar como perita.

(b) El especial conocimiento, destreza, experiencia, adiestramiento o instrucción de una persona que es testigo pericial podrá ser probado por cualquier evidencia admisible, incluyendo su propio testimonio.

(c) La estipulación sobre la calificación de una persona perita no es impedimento para que las partes puedan presentar prueba sobre el valor probatorio del testimonio pericial.

**perito por los conocimientos especializados que posee, ya sean producto de su experiencia o de su educación**. Dye–Tex P.R., Inc. v. Royal Ins. Co. P.R., 150 DPR 658, 663 (2000).

A su vez, la Regla 704 de evidencia dispone como sigue:

Fundamentos del testimonio pericial

Las opiniones o inferencias de una persona como testigo pericial **pueden estar basadas en hechos o datos** percibidos por ella o dentro de su conocimiento personal **o informados a ella antes de** o durante el juicio o vista. Si se trata de materia de naturaleza tal que las personas expertas en ese campo razonablemente descansan en ella para formar opiniones o hacer inferencias sobre el asunto en cuestión, los hechos o datos no tienen que ser admisibles en evidencia.

La persona proponente de una opinión o inferencia fundamentada en hechos o datos que no sean admisibles de otra manera, no revelará al Jurado esos hechos o datos, a menos que el Tribunal determine que su valor probatorio para asistir al Jurado en la evaluación del testimonio pericial es sustancialmente mayor que su efecto perjudicial. 32 LPRA Ap. VI, R. 704. (Énfasis nuestro).

Los foros de instancia tienen amplia discreción al apreciar la prueba pericial. Igualmente, **los foros revisores nos encontramos en la misma posición de los tribunales primarios en cuanto a la evaluación de determinaciones de hechos fundamentadas en la prueba pericial**. En tales situaciones, podemos adoptar nuestro propio criterio en la apreciación o evaluación de la evidencia pericial o incluso descartarla, aunque resulte técnicamente correcta. Díaz Hernández v. Pneumatics & Hydraulics, Inc., 169 DPR 273, 297 (2006); Dye-Tex P.R., Inc. v. Royal Ins. Co., P.R., *supra*, págs. 662-663 y los casos allí citados.

A tenor con la Regla 702 de Evidencia, el **valor probatorio** del testimonio pericial dependerá de varios factores, a saber: (1) si el testimonio está **basado en hechos o información**

**suficiente**; (2) si el testimonio es producto de **principios y métodos confiables**; (3) si la persona **aplicó los principios y métodos de manera confiable a los hechos del caso**; (4) si el principio subyacente al testimonio **ha sido aceptado generalmente en la comunidad científica**; (5) las **calificaciones o credenciales** de la persona testigo, y (6) la **parcialidad** de la persona testigo. (Énfasis nuestro).

Estos criterios no constituyen una lista taxativa, toda vez que, para conferir valor probatorio al testimonio pericial, lo esencial es su **confiabilidad**. «Existen otros factores que muy bien pudieran afectar el valor probatorio del testimonio pericial. Se trata de una determinación en la que el tribunal de instancia tiene amplia discreción y flexibilidad». Informe de las reglas de derecho probatorio, Tribunal Supremo de Puerto Rico, Secretariado de la Conferencia Judicial y Notarial, marzo de 2007, pág. 424.

Por último, el juez tiene una amplia discreción con relación a la admisión o exclusión de la prueba pericial. Sus determinaciones deben ser sostenidas a menos que sean claramente erróneas. SLG Font Bardón v. Mini-Warehouse, 179 DPR 322, 343 (2010); Salem v. United States Lines Co., 370 US 31, 35 (1962).

### B. Cláusula de no competencia

En Puerto Rico, el derecho de un trabajador a seleccionar y renunciar a su trabajo goza de una alta estima entre los valores tutelados por nuestra Constitución. Art. II, Sec. 7 de la Constitución del Estado Libre Asociado de Puerto Rico. Oriental Financial v. Nieves, 172 DPR 462, 472 (2007);

Véase, San Miguel v. ELA, 134 DPR 406, 426-27 (1993); Dolphin Int'l v. Ryder Truck Line, 127 DPR 869, 878 (1991).

Existe una clara política pública a favor del derecho de toda persona a obtener empleo, devengar ingresos y a renunciar a ese empleo en cualquier momento para dedicarse a otra ocupación. Oriental Financial v. Nieves, *supra*, págs. 472-473.  Ahora bien, se ha reconocido que este no es un derecho absoluto y como tal, "[p]uede ser renunciado o limitado por el propio trabajador. Éste puede, mediante la celebración de un contrato, establecer las condiciones razonables de trabajo que regirán la relación obrero-patronal." Oriental Financial v. Nieves, *supra*; Dolphin Int'l v. Ryder Truck Line, *supra*, pág. 878.

En cuanto a los contratos, es norma conocida que, en nuestra jurisdicción, los contratos son una fuente de obligación. Art. 1042 del Código Civil, 31 LPRA sec. 2992.[11] De igual forma, es harto conocido que las obligaciones que surgen de los contratos tienen fuerza de ley entre las partes contratantes "y deben cumplirse al tenor de los mismos". Art. 1044 del Código Civil, 31 LPRA sec. 2994. No obstante, el vínculo contractual se verá limitado por la voluntad expresa de las partes y por lo "derivado de las expectativas razonables de lo que la buena fe dicta". Paine Webber Inc. v. Soc. de Gananciales, 151 DPR 307, 311 (2000).

Es precisamente a base de la libertad de contratación que, generalmente, se han validado en nuestro ordenamiento las cláusulas de no competencia. Martín´s BBQ, Inc. v. García de Gracia, 178 DPR 978 (2010); Arthur Young & Co. v. Vega III, 136 DPR 157 (1994). Estas son las cláusulas que se incorporan en un

---

[11] Se hace referencia al Código Civil de 1930 debido a que los hechos que dieron lugar al recurso de epígrafe ocurrieron antes de la vigencia del Código Civil de Puerto Rico de 2020, Ley Núm. 55-2020 de 1 de junio de 2020, según enmendado. 31 LPRA sec. 5311 *et seq*.

contrato "con el propósito de restringir que una de las partes se involucre en un negocio o una actividad mediante el cual pueda competir con la otra". Martín´s BBQ, Inc. v. García de Gracia, *Id.*, pág. 990. Este tipo de cláusulas usualmente se incluyen, entre otros, en contratos de empleo siguiendo la regla de razonabilidad. *Id*. Esto es, siempre y cuando la cláusula sea razonable a la luz de los siguientes criterios:

> Primero, el patrono debe tener un interés legítimo en dicho acuerdo, esto es, que, de no recibir la protección de una cláusula de no competencia, su negocio se vería sustancialmente afectado. La magnitud de este interés se medirá, entre otras cosas, a la luz de la posición del empleado dentro de la empresa. Esto es, la existencia del interés del patrono estará directamente relacionada y dependerá de que el empleado, por la posición que asume en la empresa, esté facultado para competir de forma efectiva con su patrono en un futuro.

> Segundo, el alcance de la prohibición debe corresponder con el interés del patrono, en cuanto a objeto, término y lugar de restricción o clientes afectados. El objeto de la prohibición se debe limitar a actividades similares a las efectuadas por el patrono; no es necesario que se limite a las funciones específicas del empleado. **El término de no competencia no debe exceder de doce (12) meses, entendiéndose que cualquier tiempo adicional es excesivo e innecesario para proteger adecuadamente al patrono**. Por último, respecto al alcance de la prohibición, el contrato debe especificar los límites geográficos o los clientes afectados. En cuanto al área geográfica a la que aplica la restricción, ésta debe limitarse a la estrictamente necesaria para evitar la competencia real entre el patrono y el empleado. Cuando la prohibición de competencia se refiere a los clientes, debe referirse sólo a aquellos que el empleado atendió personalmente durante un periodo razonable de tiempo antes de renunciar, y que, al hacerlo, o en un periodo inmediatamente anterior a la renuncia, todavía eran clientes del patrono. Estos elementos se evaluarán teniendo en mente la naturaleza de la industria involucrada y el posible interés público relacionado.

> Tercero, el patrono debe ofrecer una contraprestación a cambio de la firma del acuerdo de no competir por parte del empleado. Esta contraprestación puede consistir, por ejemplo, en la obtención de un ascenso, de beneficios adicionales en el trabajo o del disfrute de cambios sustanciales

de similar naturaleza en las condiciones de empleo. Incluso sería suficiente que un candidato obtenga el empleo deseado en la empresa. Sin embargo, no se admitirá como causa del acuerdo de no competencia la mera permanencia en el empleo.

Cuarto, los pactos de no competencia, como todo contrato, deben contar con los elementos esenciales para su validez: consentimiento, objeto y causa. Artículo 1213 del Código Civil, 31 LPRA sec. 3391. Sin embargo, en este tipo de contratos seremos especialmente estrictos al asegurarnos de que el empleado firmó libre y voluntariamente el contrato de no competencia… Finalmente, es indispensable que los pactos de no competencia consten por escrito. Arthur Young & Co. v. Vega III*, supra*, págs. 175-76. Martín´s BBQ, Inc. v. García de Gracia, *Id*. (Énfasis nuestro).

En la medida en que un pacto de no competencia incumpla las condiciones antes descritas, será considerado contrario a la buena fe contractual y al orden público por restringir excesiva e injustificadamente la libertad del empleado para trabajar y la libertad del público en general para seleccionar. Arthur Young & Co. v. Vega III, *supra*, pág. 177. Descartando la posibilidad de modificar lo pactado entre las partes para atemperarlo a las normas razonables, nuestro más alto foro expresó que habrá de declararse "*nulo todo pacto de no competir que no cumpla con las condiciones anteriores*". Martín´s BBQ, Inc. v. García de Gracia, *supra*, pág. 992; Arthur Young & Co. v. Vega III, *supra*. (Énfasis nuestro).

En cuanto al remedio a otorgarse en caso de incumplimiento de contrato, se ha indicado que, al estimar y valorizar la partida de lucro cesante, permea esencialmente un elemento de razonabilidad. S.L.G. Rodríguez v. Nationwide, 156 DPR 614, 625 (2002); Véase, Suro v. E.L.A., 111 DPR 456, 460 (1981). De manera que, lo esencial es que la base utilizada al hacer los cómputos sea una razonable en aras de una determinación prudente. Estas están sujetas a los ajustes necesarios para que

respondan a las situaciones del momento. S.L.G. Rodríguez v. Nationwide, *supra*; Véase, además, Mena Pamias v. Jiménez Meléndez, 212 DPR ___; 2023 TSPR 108.

### C. Interferencia culposa de contrato

En Gen. Office Prods. v. AM Capen's Sons, 115 DPR 553 (1984), el Tribunal Supremo reconoció que el Art. 1802 del Código Civil, 31 LPRA sec. 5141, permite la acción por interferencia culposa de terceros con obligaciones contractuales ajenas. Es decir, una acción en daños contra un tercero que, con intención cuasi delictual o culposa, interfiere con las relaciones contractuales de otro. Jusino Figueroa et al. v. Walgreens, 155 DPR 560, 575 (2001). Para que se incurra en responsabilidad, la doctrina exige que el tercero que interfiere tenga conocimiento de la lesión que ha de producirse. *Id*. Véase, L. Díez-Picazo y A. Gullón, *Sistema de Derecho Civil*, 3ra ed., Madrid, Ed. Tecnos, 1982, Vol. II, pág. 109. De igual forma, nuestro máximo foro ha señalado que la responsabilidad del tercero que interfiere con el contrato es compartida solidariamente con el contratante que, a sabiendas, lo incumple. Gen. Office Prods. v. A.M. Capen's Sons, *supra*.

El Tribunal Supremo delineó cuatro elementos constitutivos de la acción; a saber, debe probarse: (1) la existencia de un contrato; (2) que medió culpa, es decir, que el tercero actuó intencionalmente, con conocimiento de la existencia del contrato y que, al interferir con éste, se causaría perjuicio; (3) que se ocasionó un daño, y (4) un nexo causal entre el daño y el acto culposo, o sea, que el daño fue consecuencia de la actuación culposa del tercero. Dolphin Int'l of PR v. Ryder Truck Lines, *supra*, pág. 879.

### D. Cláusula de reembolso

En <u>Oriental Financial v. Nieves</u>, *supra*, el Tribunal Supremo definió el contenido de una cláusula de reembolso.[12] Explicó que "[l]a cláusula de reembolso es aquella mediante la cual el empleado se compromete a repagarle al patrono los costes incurridos por éste en su adiestramiento o educación, si el empleado finaliza su relación de empleo antes de que el patrono haya podido recuperar su inversión mediante el rendimiento del empleado". *Íd.*, pág. 474. Además de esto, estableció que "[s]u finalidad es, por lo tanto, garantizar a la empresa la amortización de los gastos que para ella ha supuesto la inversión económica efectuada en la especialización del trabajador." *Íd.* Resolvió que una cláusula de reembolso de los gastos incurridos por el patrono en el adiestramiento de un empleado, pactada entre el empleado y el patrono, es válida.  Específicamente expresó:

> Al igual que el contrato de no competencia, este tipo de cláusula será válida en la medida en que proteja intereses legítimos del patrono sin imponer cargas, en exceso onerosas, sobre el derecho del empleado a escoger y renunciar libremente a su empleo.  Somos del criterio que, en tanto y en cuanto el patrono haya ofrecido un adiestramiento o educación especializada o extraordinaria al empleado, supliendo de esta forma su desconocimiento o falta de experiencia en la industria o negocio en que se va [a] desempeñar, el patrono tiene un interés legítimo en pactar contractualmente para el reembolso de los costes incurridos. (Citas omitidas)
>
> **El adiestramiento ofrecido no tan solo tiene que ser de carácter especializado −es decir, no del proceso de aprendizaje ordinario que ocurre simultáneamente al ejercicio de cualquier oficio y profesión—sino también, tiene que conllevar**

---

[12] En el citado caso el Tribunal Supremo resolvió una controversia similar a la que se encuentra ante nuestra consideración.  En aquella ocasión el patrono demandó al empleado reclamándole la suma de $30,000 en virtud de un contrato de empleo suscrito entre ambos, el cual disponía que el empleado le reembolsaría al patrono el costo de un adiestramiento en caso de que renunciara al empleo antes de haber cumplido cuatro años en la empresa. *Oriental Financial Services v. Nieves, supra.*  En dicho contrato se pactó que el costo del adiestramiento ascendía a $60,000.00 y se estableció una escala de prorrateo de ese costo dependiendo de cuántos años el empleado hubiera trabajado para el patrono al momento de renunciar.  *Id.*

**una inversión económica considerable de parte del patrono**. Precisamente por ello, es razonable el interés del patrono de proteger o recuperar su inversión incorporando cláusulas de reembolso a los contratos de empleo.

Al reconocerle validez a este tipo de cláusula evitamos que el patrono sufra un doble daño. Por un lado, el patrono tendrá que incurrir en nuevos gastos para adiestrar su nuevo personal sin haber podido recuperar su inversión original. Además, será su competidor quien habrá de capitalizar de la inversión hecha en adiestramiento, al reclutar a una persona a la que se le han transferido los conocimientos especializados sin haber invertido en ello. (Citas omitidas). *Id.* págs. 476-477. (Énfasis nuestro).

Por otro lado, nuestro máximo foro dispuso de ciertos criterios referentes a la validez de una cláusula de reembolso. Se indicó lo siguiente:

Estas cláusulas **serán válidas en la medida en que el monto del reembolso guarde relación con los costes verdaderamente incurridos por el patrono**. Véase, Kraus, *supra,* pág. 51 ("the amount of any repayment for the cost of training should be commesurate with its actual original cost to the employer"); Stone, *supra,* pág. 755. Igualmente, el término pactado para el reembolso debe ser moderado y debe existir una correlación entre ese término y los costes del adiestramiento. Kraus, *supra,* pág. 52 ("the amount of any repayment for the cost of training should be commesurate with its actual original cost to the employer. The duration of the obligation to remain with that employer should also be moderate and reasonably correlated to the cost of the training".) **Toda vez que este tipo de cláusula impone limitaciones a la libre movilidad del empleado, <u>las mismas deberán estipularse</u> ateniéndose rigurosamente a los criterios antes mencionados, de lo contrario no serán válidas**. (Citas omitidas). *Id., págs. 477-478. (Énfasis nuestro).

Como todo contrato, el acuerdo de reembolso debe tener los elementos esenciales para su validez: consentimiento, objeto y causa. *Id*. Véase, Art. 1213 del Código Civil, 31 LPRA sec. 3391. El Tribunal Supremo añadió que, al evaluar los acuerdos de reembolso, los tribunales deben velar celosamente por que el empleado haya firmado libre y voluntariamente tal acuerdo. Al igual que en los contratos de no competencia, los tribunales no

permitirán coacción o presión indebida alguna por parte del patrono. *Id*. Véase, <u>Arthur Young & Co. v. Vega III</u>, supra, pág. 176. El foro máximo hace hincapié en que el acuerdo de reembolso debe constar por escrito. *Id*.

Con estos criterios, se estableció un balance entre el derecho constitucional que tiene todo empleado en nuestra jurisdicción a renunciar libremente a su empleo y el interés que tiene un patrono de recuperar y proteger su inversión hecha mediante adiestramientos especializados a sus empleados. *Id.*

### E. Daños continuos y daños sucesivos

Nuestro más alto foro ha reconocido y distinguido distintos tipos de daños. Entre ellos, se encuentran los daños continuos o continuados y los daños sucesivos. Los ***daños continuos*** se definen como "*aquellos producidos por uno o más actos culposos o negligentes imputables al actor, coetáneos o no, que resultan en consecuencias lesivas ininterrumpidas, sostenidas, duraderas sin interrupción, unidas entre sí, las cuales al ser conocidas hacen que también se conozca por ser previsible el carácter continuado e ininterrumpido de sus efectos, convirtiéndose en ese momento en un daño cierto compuesto por elementos de daño actual y por tanto cierto*". <u>Rivera Ruiz, et al. v. Mun. de Ponce</u>, 196 DPR 410, 417 (2016). Estos tipos de daños se distinguen por ser *daños derivados de acto ilícito como unidad y no como una pluralidad de daños particulares*.

Así pues, los daños continuados presentan tres rasgos distintivos: (1) nace de uno o varios actos culposos o negligentes imputables al mismo actor; (2) los daños ocasionados se manifiestan ininterrumpidamente, y (3) esos daños, en conjunto,

conforman un proceso perjudicial progresivo de carácter unitario. Velázquez Ortiz v. Mun. Humacao, 197 DPR 656, 665-666 (2017).

**III.**

El señor Hernández Rodríguez acude ante este foro intermedio y nos plantea la comisión de tres errores. En primer lugar, alega que el foro de instancia erró al dictar sentencia a base de un informe y testimonio pericial que carece de valor probatorio; Segundo, que el foro primario erró al imponerle el pago total del seminario que Nazareno le ofreció a su plantilla de empleados; y, por último, que erró al determinar que el daño que sufrió Nazareno era continuo.

Atenderemos en primer orden los planteamientos de error primero y tercero relacionados a la prueba pericial y la concesión de daños continuos por la suma de $673,003.

Nazareno presentó como prueba documental el informe preparado por el Dr. Del Valle y, posteriormente, el testimonio de este último como perito. El Dr. Del Valle testificó sobre los daños económicos que había sufrido Nazareno a causa de las actuaciones torticeras de los exempleados y de PR Prosthetics. Junto con el informe, la parte Apelada anejó los siguientes documentos: (a) Planillas de contribución para Negocios exentos Acogidos a la Ley 135 de 1997; (b) Planillas de contribución sobre ingresos para negocios exentos bajo programa de incentivos PR; (c) Estados financieros suscritos por el CPA Daniel Barreto, Lic. 193; (d) Tablas generadas por el Departamento de facturación de la parte aquí compareciente.

El foro de instancia encontró que el testimonio e informe del Dr. Del Valle estaban basados en hechos e información suficiente. Además, el Dr. Del Valle era un profesional en el campo de la economía y tenía amplia experiencia en casos como el de epígrafe.

Por ello, el tribunal de instancia le otorgó mérito al perito e informe pericial preparado por este.

Esta determinación resulta adecuada. Surge del expediente que el informe pericial del Dr. Del Valle y los anejos fue emitido el 13 de octubre de 2012 y entregado al representante legal del demandado, sin que fuera objetado por el aquí Apelante. A su vez, Nazareno incluyó en el Informe de Conferencia con Antelación a Juicio del 24 de octubre de 2013, enmendado el 15 de febrero de 2019, el Informe pericial del Dr. Jaime Del Valle con sus documentos como parte de la prueba documental. Del Informe de Conferencia con Antelación al Juicio no surge que el Apelante objetara el informe y los anejos.

De otro lado, el perito Dr. Del Valle, testificó el 5 de junio de 2019 y el Apelante tuvo la oportunidad de formular preguntas sobre el contenido del informe pericial y de los documentos incorporados al informe. De sus preguntas, el Apelante pudo aclarar cualquier duda en cuanto a los documentos de apoyo que consistían en planillas de contribución sobre ingresos, estados financieros de Nazareno y las tablas de ventas. Estos son los documentos en que razonablemente descansaría un perito económico para emitir su opinión, a tenor con la Regla 704 de Evidencia.

Además de los documentos anejados al informe pericial, el presidente de Nazareno, Sr. Raymond José Matos, testificó que la conducta de los codemandados le causó "una disminución en ventas". [13] Por tanto, de la vista trascendió, de forma independiente, el aspecto de la disminución en ventas. Al considerar las circunstancias de este caso, entendemos adecuada

---

[13] TPO, vista de 5 de junio de 2019, pág. 50.

y razonable la decisión del foro primario de aceptar el informe del Dr. Del Valle, perito en economía. El primer error no fue cometido.

En el tercer señalamiento de error el apelante alegó que no existía prueba demostrativa de que la salida de los codemandados exempleados en octubre de 2009 creó una "bifurcación" en los eventos futuros de Nazareno de forma permanente, más cuando la cláusula de no competencia solo prohibía la acción antijurídica por un año. En esa línea mencionó que la extensión de los daños tenía que calcularse a base de los doce (12) meses de la duración de la cláusula de no competencia. Explicó que, de acuerdo con el contrato de empleo, los exempleados eran a término indefinido, lo que significa que tenían un derecho constitucional a escoger y renunciar libremente a su ocupación. Aseveró que conceder a Nazareno daños más allá de los doce (12) meses que duraba la prohibición de no competencia, equivaldría a extender la prohibición de no competencia a más de un año, lo que es inconstitucional, según el caso de *Arthur Young*, 136 DPR 157 (1994). Nos solicitó que revoquemos la determinación del TPI o en la alternativa, devolvamos el caso al foro primario para que se determine el total de las pérdidas de Nazareno del período de un año a partir del 30 de septiembre de 2009 al 30 de septiembre de 2010.

El apelado, por su parte, alegó que el daño futuro predecible está basado en la trayectoria y experiencia pasada en las ventas de los exempleados codemandados exclusivamente. Adujo que un daño irreparable tiene una causa pasada y unas implicaciones futuras. Aseveró que "en la medida que las ventas futuras de Nazareno a partir de diciembre de 2011 hayan continuado siendo afectadas, entonces se configura la permanencia del daño

económico, lo que fue estimado por el perito."[14]  Sostuvo que no se puede limitar al periodo de daños a la duración de las cláusulas de no competencia, ya que contraviene el concepto jurisprudencial de daños irreparables.[15]  Evaluamos.

El Dr. Jaime L. del Valle Caballero rindió un informe pericial el 13 de octubre de 2012, enmendado 30 de marzo de 2017, para estimar las posibles pérdidas económicas de Nazareno.[16]  El perito propuso dos alternativas para valorar los daños de Nazareno.

En el primer escenario informó que las ganancias netas dejadas de recibir por el período de **26 meses** entre noviembre de 2009 y diciembre de 2012 eran por la cantidad de $104,988 ($1,003,392 x 0.104633).  La segunda alternativa era capitalizando esta pérdida por el factor de valor presente de 7.2% para obtener pérdida capitalizada a su valor presente de $673,002.  Para llegar a este resultado el perito indicó lo siguiente:

1. Se anualizó la pérdida de $104,988 dividiendo esta entre los 26 meses que la componen y multiplicándola por 12 meses de un año: $\frac{\$104,988}{26}$ x 12=$4,038x 12= $48,456

2. La pérdida anualizada ($48,456) se capitaliza multiplicándola por el recíproco de la tasa de descuento (7.2%): $\frac{\$48,456}{0.072}$=$673,002

Al aplicar esta segunda opción, el Dr. Del Valle concluyó que la pérdida a perpetuidad de Nazareno ascendía a $673,002. Según el testimonio del Dr. Del Valle, este aplicó la última alternativa, "en caso de que se demuestre que esos eventos han podido causar un año continuo."[17]

---

[14] Alegato de Nazareno, pág. 39.
[15] Íd.
[16] Apéndice pág. 598.
[17] Testimonio del perito Dr. Del Valle, 5 de junio de 2019, págs. 252, Ins 23-24; 253, ln. 1.

En cuanto al contrato de no competencia el perito declaró que no examinó los contratos de los demandados que tenían una cláusula de no competencia.[18] En el proceso de analizar, el perito no recordaba si le dijeron que la duración del contrato de competencia duraba un año. No recordaba si se lo habían informado específicamente.[19]

Como vemos, el perito brindó dos opciones para que el tribunal determinara la formula aplicable a los hechos. A esos fines, en la vista del 6 de junio de 2019 el foro primario instruyó a las partes que realizaran un análisis de la extensión del daño. Requirió que le informaran, "¿Cuál sería el cómputo que llevar a cabo si este tribunal determina que el periodo de veintiséis (26) [meses] no era el correcto y que el correcto debió de ser la cláusula de no competencia que eran doce (12) meses? ¿Cómo eso cambiaría los números en cuanto a ese impacto?"[20] Más adelante el juez de instancia indicó: "Si baja doce (12) meses, pues entonces los números entiendo que van a cambiar. No se si aumentarán o disminuirán, porque matemático no soy, pero tienen un impacto."[21]

Finalmente, el tribunal de instancia aplicó la alternativa de daño continuo o bajo el concepto de perpetuidad para conceder el daño por $633,003. Entendemos que el foro primario incidió al extender a perpetuidad los daños contractuales. Nos explicamos.

Es un hecho que los codemandados exempleados de Nazareno incumplieron la cláusula de empleo de no competencia establecida por un año. Este tipo de cláusulas usualmente se incluyen al contrato de empleo, siguiendo la regla de

---

[18] Id., pág. 346.
[19] Id., pág. 346, lns. 11-24.
[20] TPO, 6 de junio de 2019, págs. 101-102.
[21] Id, pág. 102.

razonabilidad, bajo ciertos criterios. Estos parten de la premisa de que, si el patrono no recibe la protección, el negocio se vería sustancialmente afectado. Ahora bien, es norma que el término de no competencia **no debe exceder de doce (12) meses**. Se entiende que cualquier tiempo adicional es **excesivo e innecesario para proteger adecuadamente al patrono**. En la medida en que un pacto de no competencia incumpla las condiciones antes descritas, será considerado contrario a la buena fe contractual y al orden público por **restringir excesiva e injustificadamente la libertad del empleado para trabajar y la libertad del público en general para seleccionar.** Se considera nulo todo pacto de no competir que no cumpla con las condiciones anteriores.[22]

En este caso, solo restaba determinar la extensión y cuantía de los daños. Según el ordenamiento jurídico, las cláusulas de no competencia se incluyen bajo el supuesto de que, al incumplirse con lo pactado, el patrono va a sufrir un daño. De manera que las partes saben de antemano que el incumplimiento acarrea un daño. Ahora bien, la prohibición está limitada por el término de **un año.** Este es el periodo razonable para proteger adecuadamente al patrono, pues cualquier tiempo adicional se considera excesivo e innecesario. Por tanto, resulta contrario a derecho, extender a perpetuidad o a más de un año, los daños concedidos al patrono.

Esto es, el acto de otorgar daños por un periodo mayor a doce meses es contrario a la normativa que establece que la extensión de los contratos de competencia solo debe subsistir por doce meses, so pena de nulidad. Conceder una compensación a

---

[22] <u>Arthur Young & Co. v. Vega III</u>, *supra*, págs. 175-177.

perpetuidad, implicaría extender el contrato de no competencia a más de un año, lo cual está prohibido en nuestro ordenamiento jurídico y es contrario a lo pactado entre las partes. Además, ello trastocaría el derecho a toda persona a escoger un empleo y renunciar a este para dedicarse a otro empleo.  De manera que, debemos ceñirnos a las únicas limitaciones que contiene el contrato, que es la limitación de un año para otorgar los daños correspondientes a ese periodo.

Tomando como base el informe pericial del Dr. Jaime L. Del Valle, este proyectó las ganancias netas dejadas de percibir por el periodo de 26 meses contados desde noviembre de 2009 a $104,988.  Esa pérdida la llevó a una anualidad de 12 meses, calculada en **$48,456**.    Esta cantidad resulta razonable y adecuada para compensar el daño económico de Nazareno. Como el contrato no establece una penalidad por el incumplimiento, es correcto concluir que el señor Hernández Rodríguez y los exempleados demandados respondan por las pérdidas y la reducción en ventas que provocaron con sus actuaciones, pero limitado a un año.  En ese sentido modificamos la sentencia para reducir el daño económico a $48,456.

Por último, otra de las cuantías reclamadas por Nazareno era la suma de $49,500 correspondiente a un adiestramiento que la parte apelada adquirió para sus exempleados vendedores y demás empelados en el departamento de ventas. Arguye Nazareno que le corresponde al señor Hernández Rodríguez reembolsar el costo del seminario por haber violado el contrato de no competencia, cuyo desenlace fue la renuncia simultanea de los exempleados demandados.

Por su parte, el señor Hernández Rodríguez argumenta que no le corresponde cubrir los gastos incurridos por Nazareno en el

seminario puesto que se trata de una acción de reembolso prohibida. Arguye el apelante que en el contrato de empleo entre Nazareno y los empleados demandados no se incluyó una cláusula de reembolso. Al no constar por escrito una cláusula de esta naturaleza, Nazareno se ve imposibilitada de recobrarle a sus empleados los gastos incurridos por esta en recursos tales como adiestramientos. El señor Hernández Rodríguez plantea que el recobro del adiestramiento no es más que una acción de reembolso disfrazada como una acción por daños. Esto es, como Nazareno no incluyó una cláusula de reembolso en los contratos de empleo, se ve imposibilitada de recobrarle a los exempleados demandados el dinero invertido en el adiestramiento. Por ello, el apelante alega que Nazareno pretende imputarle el cobro del seminario sin tener un fundamento en derecho que sustente dicho reclamo.

Si bien es cierto que PR Prosthetics interfirió de manera culposa en la relación contractual habida entre Nazareno y los exempleados demandados, no surge del expediente razón alguna para conceder la partida de $49,500 correspondientes al adiestramiento. Tanto es así, que Nazareno no levantó ningún fundamento en derecho que sustentara su reclamo. Al igual que el señor Hernández Rodríguez, consideramos que el cobro del adiestramiento es un subterfugio para que Nazareno pueda recobrar lo que de otra forma no hubiese podido recobrarles a los exempleados demandados.

De ninguno de los anejos incluidos en el apéndice que constituyan parte del contrato de empleo se desprende una cláusula de reembolso. Ante ello, decretamos improcedente que el señor Hernández Rodríguez pague el seminario.

Por último, surge de la sentencia que el foro primario le impuso al apelante José Hernández la suma de $25,000 por honorarios de abogado por temeridad. Conforme al resultado al que hemos llegado, procede eliminar la cuantía de honorarios de abogado pues no hubo temeridad.

Esta determinación la hacemos acorde a nuestra facultad inherente de considerar y resolver errores patentes que surjan de un recurso aun cuando éstos no hayan sido presentados por las partes. Vilanova v. Vilanova, 184 DPR 824, 848 (2012); SLG Flores-Jiménez v. Colberg, 173 DPR 843, 851 (2008), citando a Hernández v. Espinosa, 145 DPR 248, 264 (1998).

**IV.**

Por los fundamentos antes expuestos, modificamos la *Sentencia* apelada, a los fines de reducir el daño económico a $48,456, eliminar la partida por concepto de honorarios de abogado y eliminar la partida de $49,500 por concepto del seminario. Así modificada, se confirma.

Lo acordó el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones